**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER WILLIAMS, on behalf of himself and all others similarly situated,    ) ) ) | |
| Plaintiff,    ) ) | Case No. |
| v.    ) ) | Hon. |
| JACKSON PARK SUPPORTIVE LIVING FACILITY, LLC and JACKSON PARK SLF, LLC,    ) ) ) ) | |
| Defendants.    ) | |

**DECLARATION OF DAVID POKORNY**

Pursuant to 28 U.S.C. § 1746, David Pokorny, declares and states as follows:

1.     I have personal knowledge of the matters set forth in this declaration and would be competent to testify thereto at a trial or hearing in this matter.

2.     I am the Operations Manager at Jackson Park SLF, LLC ("Jackson Park SLF"). I have been employed by Jackson Park SLF since January 1, 2019. My duties include overseeing and administering workplace issues, such as time and attendance policies and collective bargaining agreements (CBAs) between Jackson Park SLF and the United Food & Commercial Workers International Union Local 1546 ("Local 1546").

3.     I have reviewed Jackson Park SLF's business and employment records, which it maintains in the ordinary course of its business.

4.     I have reviewed the class action complaint in the matter titled *Williams v. Jackson Park Supportive Living Facility, LLC and Jackson Park SLF, LLC*, Case No. 2019-CH-09286 (Circuit Court of Cook County), which I understand is being removed to federal court. The complaint and summons that were served on Jackson Park SLF are attached hereto as Exhibit A. Jackson Park SLF was served with the complaint and summons on November 14, 2019. (Ex. B.)

5.     Based on my review of Jackson Park SLF's records, Plaintiff Christopher Williams has been employed with Jackson Park SLF since October 2016 as a Certified Nurse Aid. Since the beginning of his employment, as a Certified Nurse Aid, he has been a member of Local 1546.

6.     The most recent collective bargaining agreement between Jackson Park SLF and Local 1546, which governs the terms and conditions of Plaintiff Williams' employment is effective from June 1, 2017 to May 31, 2020. (See Ex. D.) Prior to entering into that CBA, collective bargaining agreement covering workers at our site was effective from June 1, 2014 to May 31, 2017. (See Ex. C.)

7.     The CBA dated from June 1, 2014 to May 31, 2017 was originally entered into between Local 1546 and Jackson Park SLF's predecessor, which was named Jackson Park Supportive Living Facility, LLC. Jackson Park SLF purchased the business from Jackson Park Supportive Living Facility, LLC in January 2016 and agreed to stand in its place with regard to the collective bargaining agreement with Local 1546. After Jackson Park SLF purchased the business in January 2016, Jackson Park SLF, Local 1546, and the members of Local 1546 treated the CBA as if Jackson Park SLF were its predecessor, Jackson Park Supportive Living Facility. Subsequently Jackson Park SLF and Local 1546 agreed to the second CBA (Ex. D) with Jackson Park SLF expressly named as the employer.

8.     The labor agreements provide that Local 1546 is the sole collective bargaining agent for Local 1546's members. (Ex. C at § 1.1; Ex. D at § 1.1.) The agreements state that they cover various employee classifications, including Certified Nurse Aids (§ 1.1), include a Management Rights section (§ 3.1), and a grievance procedure that culminates in arbitration in accordance with the rules of the Federal Mediation and Conciliation Service (§§ 18.1-18.2).

9.     Jackson Park SLF began using a TimeclockPlus HP-1000 time clock at its facility in January 2016. Jackson Park SLF informed Local 1546 members that it would use the clock for punching in and out of work. Local 1546 did not object to the use of the clock or seek an amendment to the relevant labor agreement. In March 2018, Jackson Park SLF replaced the HP-1000 clock with a TimeclockPlus GT-400 time clock. It again informed Local 1546 members that Jackson Park SLF would use the clock for punching in and out of work. Local 1546 did not object to the use of the clock or seek an amendment to the relevant labor agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 16, 2019

David Pokorny

# Exhibit A

Return Date: No return date scheduled
Hearing Date: 1/29/2020 9:30 AM - 9:30 AM
Courtroom Number: 2308
Location: District 1 Court
        Cook County, IL

FILED
10/24/2019 1:18 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH09286

7094362

2120 - Served          2121 - Served
2220 - Not Served     2221 - Not Served
2320 - Served By Mail   2321 - Served By Mail
2420 - Served By Publication 2421 - Served By Publication
Summons - Alias Summons             **(08/01/18) CCG 0001 A**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CHANCERY DEPARTMENT

Christopher Williams, et al

v.

Jackson Park Supportive Living Facility, LLC
and Jackson Park SLF, LLC

Case No.  2019CH09286

☑ **SUMMONS**  ☐ **ALIAS SUMMONS**

To each Defendant:  **Registered Agent: Elchanan Finestone**

                    **4105 Oakton St., Skokie, Illinois 60076**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Summons - Alias Summons**
(08/01/18) CCG 0001 B

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

Atty. No.: 43734

Atty Name: James B. Zouras

Atty. for: Stephan Zouras LLP

Address: 100 N. Riverside Plaza

City: Chicago

State: IL    Zip: 60606

Telephone: 3122331550

Primary Email: jzouras@stephanzouras.com

Witness: 10/24/2019 1:18 PM DOROTHY BROWN

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

# CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

◉ Richard J Daley Center
50 W Washington
Chicago, IL 60602

○ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

○ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

## Daley Center Divisions/Departments

○ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois
cookcountyclerkofcourt.org

Return Date: No return date scheduled
Hearing Date: 1/29/2020 9:30 AM - 9:30 AM
Courtroom Number: 2308
Location: District 1 Court
       Cook County, IL

FILED
10/24/2019 1:18 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH09286

7094362

2120 - Served
2220 - Not Served
2320 - Served By Mail
2420 - Served By Publication
Summons - Alias Summons

2121 - Served
2221 - Not Served
2321 - Served By Mail
2421 - Served By Publication

(08/01/18) CCG 0001 A

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CHANCERY DEPARTMENT

Christopher Williams, et al

v.

Jackson Park Supportive Living Facility, LLC
and Jackson Park SLF, LLC

Case No.   2019CH09286

☑ **SUMMONS**    ☐ **ALIAS SUMMONS**

To each Defendant:    **Registered Agent: Elchanan Finestone**

                   **4105 Oakton St., Skokie, Illinois 60076**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons,** not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Summons - Alias Summons**

(08/01/18) CCG 0001 B

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

Witness: _____ 10/24/2019 1:18 PM DOROTHY BROWN

Atty. No.: 43734

Atty Name: James B. Zouras

Atty. for: Stephan Zouras LLP

DOROTHY BROWN, Clerk of Court

Address: 100 N. Riverside Plaza

Date of Service: _____

City: Chicago

(To be inserted by officer on copy left with

State: IL    Zip: 60606

Defendant or other person):

Telephone: 3122331550

Primary Email: jzouras@stephanzouras.com

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 2 of 3

# CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

- Richard J Daley Center
  50 W Washington
  Chicago, IL 60602

- District 2 - Skokie
  5600 Old Orchard Rd
  Skokie, IL 60077

- District 3 - Rolling Meadows
  2121 Euclid
  Rolling Meadows, IL 60008

- District 4 - Maywood
  1500 Maybrook Ave
  Maywood, IL 60153

- District 5 - Bridgeview
  10220 S 76th Ave
  Bridgeview, IL 60455

- District 6 - Markham
  16501 S Kedzie Pkwy
  Markham, IL 60428

- Domestic Violence Court
  555 W Harrison
  Chicago, IL 60607

- Juvenile Center Building
  2245 W Ogden Ave, Rm 13
  Chicago, IL 60602

- Criminal Court Building
  2650 S California Ave, Rm 526
  Chicago, IL 60608

## Daley Center Divisions/Departments

- Civil Division
  Richard J Daley Center
  50 W Washington, Rm 601
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Chancery Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Domestic Relations Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Civil Appeals
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Criminal Department
  Richard J Daley Center
  50 W Washington, Rm 1006
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- County Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Probate Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Law Division
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Traffic Division
  Richard J Daley Center
  50 W Washington, Lower Level
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

Return Date: No return date scheduled
Hearing Date: 1/29/2020 9:30 AM - 9:30 AM
Courtroom Number: 2308
Location: District 1 Court
     Cook County, IL

FILED
10/22/2019 3:57 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH09286

7060360

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

CHRISTOPHER WILLIAMS, individually, and on behalf of all others similarly situated, )
)
)
Plaintiff, )
)
v. )
)
JACKSON PARK SUPPORTIVE LIVING FACILITY, LLC and JACKSON PARK SLF, LLC, )
)
)
)
Defendants. )

Case No. 2019-CH-09286

Judge Neil H. Cohen

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Chris Williams ("Williams" or "Plaintiff"), by and through his attorneys, individually and on behalf of all others similarly situated (the "Class"), brings the following Class Action Complaint ("Complaint") pursuant to the Illinois Code of Civil Procedure, 735 ILCS §§ 5/2-801 and 2-802, against Jackson Park Supportive Living Facility, LLC and Jackson Park SLF, LLC (collectively, "Jackson Park" or "Defendants"), their subsidiaries and affiliates, to redress and curtail Defendants' unlawful collection, use, storage, and disclosure of Plaintiff's sensitive and proprietary biometric data. Plaintiff alleges as follows upon personal knowledge as to himself, his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1.     Jackson Park is in the business of rehabilitation and supportive living for adults with physical disabilities.

1

2.     When Defendants hire an employee, including Plaintiff, he or she is enrolled in their employee database(s) using a scan of his or her handprint. Defendants use the employee database(s) to monitor the time worked by their hourly employees.

3.     While many employers use conventional methods for tracking time worked (such as ID badges or punch clocks), Jackson Park's employees are required, as a condition of employment, to have their handprints scanned by a biometric timekeeping device.

4.     Biometrics are not relegated to esoteric corners of commerce. Many businesses – such as Jackson Park – and financial institutions have incorporated biometric applications into their workplace in the form of biometric timeclocks or authenticators, and into consumer products, including such ubiquitous consumer products as checking accounts and cell phones.

5.     Unlike ID badges or time cards – which can be changed or replaced if stolen or compromised – handprints are unique, permanent biometric identifiers associated with each employee. This exposes Jackson Park's employees to serious and irreversible privacy risks. For example, if a database containing handprints or other sensitive, proprietary biometric data is hacked, breached, or otherwise exposed – like in the recent Yahoo, eBay, Equifax, Uber, Home Depot, MyFitnessPal, Panera, Whole Foods, Chipotle, Omni Hotels & Resorts, Trump Hotels, and Facebook/Cambridge Analytica data breaches or misuses – employees have **_no_** means by which to prevent identity theft, unauthorized tracking or other unlawful or improper use of this highly personal and private information.

6.     In 2015, a data breach at the United States Office of Personnel Management exposed the personal identification information, including biometric data, of over 21.5 million federal employees, contractors, and job applicants. U.S. Off. of Personnel Mgmt., *Cybersecurity Incidents* (2018), *available at* www.opm.gov/cybersecurity/cybersecurity-incidents.

7.     An illegal market already exists for biometric data. Hackers and identity thieves have targeted Aadhaar, the largest biometric database in the world, which contains the personal and biometric data – including handprints, iris scans, and facial photographs – of over a billion Indian citizens. *See* Vidhi Doshi, *A Security Breach in India Has Left a Billion People at Risk of Identity Theft*, The Washington Post (Jan. 4, 2018), *available at* https://www.washingtonpost.com/news/worldviews/wp/2018/01/04/a-security-breach-in-india-has-left-a-billion-people-at-risk-of-identity-theft/?utm_term=.b3c70259f138.

8.     In January 2018, an Indian newspaper reported that the information housed in Aadhaar was available for purchase for less than $8 and in as little as 10 minutes. Rachna Khaira, *Rs 500, 10 Minutes, and You Have Access to Billion Aadhaar Details*, The Tribune (Jan. 4, 2018), *available at* http://www.tribuneindia.com/news/nation/rs-500-10-minutes-and-you-have-access-to-billion-aadhaar-details/523361.html.

9.     Recognizing the need to protect its citizens from situations like these, Illinois enacted the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.*, specifically to regulate companies that collect, store and use Illinois citizens' biometrics, such as handprints.

10.     Notwithstanding the clear and unequivocal requirements of the law, Defendants disregard their employees' statutorily protected privacy rights and unlawfully collect, store, disseminate, and use employees' biometric data in violation of BIPA. Specifically, Defendants have violated and continue to violate BIPA because they did not and continue not to:

    a.     Properly inform Plaintiff and others similarly situated in writing of the specific purpose and length of time for which their handprints were being collected, stored, and used, as required by BIPA;

    b.     Provide a publicly available retention schedule and guidelines for permanently destroying Plaintiff's and other similarly-situated individuals' handprints, as required by BIPA; and

3

    c.    Receive a written release from Plaintiff and others similarly situated to collect, store, disseminate, or otherwise use their handprints, as required by BIPA.

    d.    Obtain consent from Plaintiff and others similarly situated to disclose, redisclose, or otherwise disseminate their handprints to a third party as required by BIPA.

11.    Accordingly, Plaintiff, on behalf of himself as well as the putative Class, seeks an Order: (1) declaring that Defendants' conduct violates BIPA; (2) requiring Defendants to cease the unlawful activities discussed herein; and (3) awarding statutory damages to Plaintiff and the proposed Class.

## PARTIES

12.    Plaintiff Chris Williams is a natural person and a citizen of the State of Illinois.

13.    Defendant Jackson Park Supportive Living Facility, LLC is an Illinois corporation that is registered with the Illinois Secretary of State and conducts business in the State of Illinois, including Cook County.

14.    Defendant Jackson Park SLF, LLC is an Illinois corporation that is registered with the Illinois Secretary of State and conducts business in the State of Illinois, including Cook County.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over Defendants pursuant to 735 ILCS § 5/2-209 because Defendants conduct business transactions in Illinois, committed the statutory violations alleged herein in Cook County and throughout Illinois, and are registered to and do conduct business in Illinois.

16.    Venue is proper in Cook County because Defendants conduct business in this State, conduct business transactions in Cook County, and committed the statutory violations alleged herein in Cook County and throughout Illinois.

## FACTUAL BACKGROUND

### I.      The Biometric Information Privacy Act.

17.      In the early 2000s, major national corporations started using Chicago and other locations in Illinois to test "new applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias." 740 ILCS § 14/5(c). Given its relative infancy, an overwhelming portion of the public became weary of this then-growing yet unregulated technology. *See* 740 ILCS § 14/5.

18.      In late 2007, a biometrics company called Pay by Touch, which provided major retailers throughout the State of Illinois with fingerprint scanners to facilitate consumer transactions, filed for bankruptcy. That bankruptcy was alarming to the Illinois Legislature because suddenly there was a serious risk that millions of fingerprint records – which, like other unique biometric identifiers, can be linked to people's sensitive financial and personal data – could now be sold, distributed, or otherwise shared through the bankruptcy proceedings without adequate protections for Illinois citizens. The bankruptcy also highlighted the fact that most consumers who used that company's fingerprint scanners were completely unaware that the scanners were not actually transmitting fingerprint data to the retailer who deployed the scanner, but rather to the now-bankrupt company, and that their unique biometric identifiers could now be sold to unknown third parties.

19.      Recognizing the "very serious need [for] protections for the citizens of Illinois when it [came to their] biometric information," Illinois enacted BIPA in 2008. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276; 740 ILCS 14/5.

20.      Additionally, to ensure compliance, BIPA provides that, for <u>each</u> violation, the prevailing party may recover $1,000 or actual damages, whichever is greater, for negligent

violations and $5,000, or actual damages, whichever is greater, for intentional or reckless violations. 740 ILCS 14/20.

21.     BIPA is an informed consent statute which achieves its goal by making it unlawful for a company to, among other things, collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first:

   a.  Informs the subject in writing that a biometric identifier or biometric information is being collected, stored or used;

   b.  Informs the subject in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

   c.  Receives a written release executed by the subject of the biometric identifier or biometric information.

*See* 740 ILCS 14/15(b).

22.     BIPA specifically applies to employees who work in the State of Illinois. BIPA defines a "written release" specifically "in the context of employment [as] a release executed by an employee as a condition of employment." 740 ILCS 14/10.

23.     Biometric identifiers include retina and iris scans, voiceprints, fingerprints and facial geometry, and – most importantly here – handprints. *See* 740 ILCS 14/10. Biometric information is separately defined to include any information based on an individual's biometric identifier that is used to identify an individual. *Id.*

24.     BIPA also establishes standards for how companies must handle Illinois citizens' biometric identifiers and biometric information. *See, e.g.,* 740 ILCS 14/15(c)-(d). For example, BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or

biometric information without first obtaining consent for such disclosures. *See* 740 ILCS 14/15(d)(1).

25. BIPA also prohibits selling, leasing, trading, or otherwise profiting from a person's biometric identifiers or biometric information (740 ILCS 14/15(c)) and requires companies to develop and comply with a written policy – made available to the public – establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting such identifiers or information has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first. 740 ILCS 14/15(a).

26. The Illinois legislature enacted BIPA due to the increasing use of biometric data in financial and security settings, the general public's hesitation to use biometric information, and – most significantly – the unknown ramifications of biometric technology. Biometrics are biologically unique to the individual and, once compromised, an individual is at a heightened risk for identity theft and left without any recourse.

27. BIPA provides individuals with a private right of action, protecting their right to privacy regarding their biometrics. BIPA also protects individuals' rights to know the precise nature for which their biometrics are used and how they are being stored and ultimately destroyed, allowing individuals to make a truly informed choice. Unlike other statutes that only create a right of action if there is a qualifying data breach, BIPA strictly regulates the manner in which entities may collect, store, use, and disseminate biometrics and creates a private right of action for lack of statutory compliance.

28.     Plaintiff, like the Illinois legislature, recognizes how imperative it is to keep biometric information secure. Biometric information, unlike other personal identifiers such as a social security number, cannot be changed or replaced if hacked or stolen.

**II.     Defendants Violate the Biometric Information Privacy Act.**

29.     By the time BIPA passed through the Illinois Legislature in mid-2008, most companies who had experimented with using employees' biometric data stopped doing so.

30.     However, Jackson Park failed to take note of the shift in Illinois law governing the collection, use, storage, and dissemination of biometric data. As a result, Defendants continue to collect, store, use and disseminate employees' biometric data in violation of BIPA.

31.     Specifically, when employees are hired, Defendants scan, collect and obtain their handprints to enroll them in their employee database(s).

32.     Jackson Park uses an employee time tracking system that requires employees to use their handprint as a means of authentication. In accordance with Defendants' policy, all hourly employees are required to use their handprints to clock-in and clock-out for attendance purposes.

33.     Until very recently, Defendants failed to inform any employees that they disclose or disclosed their handprint data to third-parties, including third parties which host the biometric data in their data centers, and failed to inform employees of the purposes and duration for which they collect their sensitive biometric data.

34.     At no time did Defendants secure written releases from employees before collecting their handprints.

35.     Furthermore, Defendants fail to provide employees with a written, publicly available policy identifying their retention schedule and guidelines for permanently destroying

employees' handprints when the initial purpose for collecting or obtaining their handprints is no longer relevant, as required by BIPA.

36.     The Pay by Touch bankruptcy that catalyzed the passage of BIPA, as well as the recent data breaches, highlight why such conduct – where individuals are aware that they are providing a handprint, but not aware of to whom or for what purposes they are doing so – is dangerous. This bankruptcy spurred Illinois citizens and legislators into realizing that it is crucial for individuals to understand when providing biometric identifiers, such as a handprint, who exactly is collecting their biometric data, where it will be transmitted, for what purposes, and for how long. Defendants disregard these obligations and their employees' statutory rights and instead unlawfully collect, store, use and disseminate their employees' biometric identifiers and information, without ever receiving the individual's informed written consent required by BIPA.

37.     Upon information and belief, Defendants lack retention schedules and guidelines for permanently destroying Plaintiff's and other similarly-situated individuals' biometric data and have not and will not destroy Plaintiff's and other similarly-situated individuals' biometric data when the initial purpose for collecting or obtaining such data has been satisfied or within three years of the employee's last interaction with the company.

38.     Plaintiff and others similarly situated are not told what might happen to their biometric data if and when Defendants merge with another company, or worse, if and when Defendants' businesses fold, or when the other third parties that have received employees' biometric data businesses fold.

39.     Since Defendants neither publish a BIPA-mandated data retention policy nor disclose the purposes for their collection and use of biometric data, Jackson Park's employees have no idea the extent to whom Defendants sell, disclose, redisclose, or otherwise disseminates their

biometric data. Moreover, Plaintiff and others similarly situated are not told to whom Defendants currently disclose their biometric data, or what might happen to their biometric data in the event of a merger or a bankruptcy.

40.     These violations have raised a material risk that Plaintiff's and other similarly-situated individuals' biometric data will be unlawfully accessed by third parties.

41.     By and through the actions detailed above, Defendants disregarded Plaintiff's and other similarly-situated individuals' legal rights in violation of BIPA.

**III.    Plaintiff Chris Williams' Experience**

42.     Plaintiff Chris Williams began working for Jackson Park as a Nurse Technician in October of 2016, at a facility located at 1448 East 75th Street Chicago, Illinois 60619.

43.     Upon being hired, Jackson Park scanned, collected and/or obtained Williams' handprint so Jackson Park could use it as an authentication method to track his time.

44.     Defendants subsequently stored Plaintiff's handprint data in their employee database(s).

45.     Plaintiff scanned his handprint each time he clocked in for work and clocked out of work.

46.     Until very recently, Plaintiff was never informed of the specific limited purposes or length of time for which Jackson Park collects, stores, uses and/or disseminates his biometric data.

47.     Plaintiff has never been informed of any biometric data retention policy developed by Jackson Park, nor has he ever been informed of whether Jackson Park will ever permanently delete his biometric data.

48.     Plaintiff has never been provided with nor ever signed a written release allowing Jackson Park to collect, store, use or disseminate his biometric data.

49.     Plaintiff has continuously and repeatedly been exposed to the risks and harmful conditions created by Defendants' <u>multiple</u> violations of BIPA alleged herein.

50.     No amount of time or money can compensate Plaintiff if his biometric data is compromised by the lax procedures through which Defendants captured, stored, used, and disseminated his and other similarly-situated individuals' biometrics. Moreover, Plaintiff would not have provided his biometric data to Defendants if he had known that Defendants would retain such information for an indefinite period of time without his consent.

51.     A showing of actual damages is not necessary in order to state a claim under BIPA. *See Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, ¶ 40 ("[A]n individual need not allege some actual injury or adverse effect, beyond violation of his or her rights under the Act, in order to qualify as an "aggrieved" person and be entitled to seek liquidated damages and injunctive relief pursuant to the Act").

52.     As Plaintiff is not required to allege or prove actual damages in order to state a claim under BIPA, he seeks statutory damages under BIPA as compensation for the injuries caused by Defendants. *Rosenbach*, 2019 IL 123186, ¶ 40.

**CLASS ALLEGATIONS**

53.     Pursuant to the Illinois Code of Civil Procedure, 735 ILCS 5/2-801, Plaintiff brings claims on his own behalf and as a representative of all other similarly-situated individuals pursuant to BIPA, 740 ILCS 14/1, *et seq.*, to recover statutory penalties, prejudgment interest, attorneys' fees and costs, and other damages owed.

54.     As discussed *supra*, Section 14/15(b) of BIPA prohibits a company from, among other things, collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's or a customer's biometric identifiers or biometric information, unless it *first* (1) informs the individual in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the individual in writing of the specific purpose(s) and length of time for which a biometric identifier or biometric information is being collected, stored, and used; *and* (3) receives a written release executed by the subject of the biometric identifier or biometric information. 740 ILCS 14/15.

55.     Plaintiff seeks class certification under the Illinois Code of Civil Procedure, 735 ILCS 5/2-801, for the following class of similarly-situated individuals under BIPA:

> All individuals working for Defendants in the State of Illinois who had their handprints collected, captured, received, otherwise obtained, maintained, stored or disclosed by Defendants during the applicable statutory period.

56.     This action is properly maintained as a class action under 735 ILCS 5/2-801 because:

A.     The class is so numerous that joinder of all members is impracticable;

B.     There are questions of law or fact that are common to the class;

C.     Plaintiff's claims are typical of the claims of the class; and,

D.     Plaintiff will fairly and adequately protect the interests of the class.

**Numerosity**

57.     The total number of putative class members exceeds fifty (50) individuals. The exact number of class members can easily be determined from Jackson Park's payroll records.

**Commonality**

58.     There is a well-defined commonality of interest in the substantial questions of law and fact concerning and affecting the Class in that Plaintiff and all members of the Class have been

harmed by Defendants' failure to comply with BIPA. The common questions of law and fact include, but are not limited to the following:

A.   Whether Defendants collected, captured, maintained, stored or otherwise obtained Plaintiff's and the Class's biometric identifiers or biometric information;

B.   Whether Defendants properly informed Plaintiff and the Class of their purposes for collecting, using, storing and disseminating their biometric identifiers or biometric information;

C.   Whether Defendants obtained a written release (as defined in 740 ILCS 14/10) to collect, use, store and disseminate Plaintiff's and the Class's biometric identifiers or biometric information;

D.   Whether Defendants have disclosed or redisclosed Plaintiff's and the Class's biometric identifiers or biometric information;

E.   Whether Defendants have sold, leased, traded, or otherwise profited from Plaintiff's and the Class's biometric identifiers or biometric information;

F.   Whether Defendants developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of their last interaction with the individual, whichever occurs first;

G.   Whether Defendants comply with any such written policy (if one exists);

H.   Whether Defendants' violations of BIPA have raised a material risk that Plaintiff's and the putative Class' biometric data will be unlawfully accessed by third parties;

I.   Whether Defendants used Plaintiff's and the Class's handprints to identify them;

J.   Whether the violations of BIPA were committed negligently; and

K.   Whether the violations of BIPA were committed intentionally or recklessly.

59.   Plaintiff anticipates that Defendants will raise defenses that are common to the class.

### Adequacy

60.     Plaintiff will fairly and adequately protect the interests of all members of the class, and there are no known conflicts of interest between Plaintiff and class members. Plaintiff, moreover, has retained experienced counsel who are competent in the prosecution of complex litigation and who have extensive experience acting as class counsel.

### Typicality

61.     The claims asserted by Plaintiff are typical of the class members he seeks to represent. Plaintiff has the same interests and suffers from the same unlawful practices as the class members.

62.     Upon information and belief, there are no other class members who have an interest individually controlling the prosecution of his or her individual claims, especially in light of the relatively small value of each claim and the difficulties involved in bringing individual litigation against one's employer. However, if any such class member should become known, he or she can "opt out" of this action pursuant to 735 ILCS 5/2-801.

### Predominance and Superiority

63.     The common questions identified above predominate over any individual issues, which will relate solely to the quantum of relief due to individual class members. A class action is superior to other available means for the fair and efficient adjudication of this controversy because individual joinder of the parties is impracticable. Class action treatment will allow a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense if these claims were brought individually. Moreover, as the damages suffered by each class member are relatively small

in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it difficult for individual class members to vindicate their claims.

64. Additionally, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially more than if claims are treated as a class action. Prosecution of separate actions by individual class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendants and/or substantially impair or impede the ability of class members to protect their interests. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

### FIRST CAUSE OF ACTION

**Violation of 740 ILCS § 14/15(a): Failure to Institute, Maintain and Adhere to Publicly-Available Retention Schedule**

65. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

66. BIPA mandates that companies in possession of biometric data establish and maintain a satisfactory biometric data retention – and, importantly, deletion – policy. Specifically, those companies must: (i) make publicly available a written policy establishing a retention schedule and guidelines for permanent deletion of biometric data (at most three years after the company's last interaction with the individual); and (ii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS 14/15(a).

67. Defendants fail to comply with these BIPA mandates.

68. Each Defendant qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

69.    Plaintiff and the Class are individuals who have had their "biometric identifiers" collected and/or obtained by each Defendant (in the form of their handprints), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS 14/10.

70.    Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS 14/10.

71.    Defendants failed to provide a publicly available retention schedule or guidelines for permanently destroying biometric identifiers and biometric information as specified by BIPA. *See* 740 ILCS § 14/15(a).

72.    Upon information and belief, Defendants lack retention schedules and guidelines for permanently destroying Plaintiff's and the Class's biometric data and have not and will not destroy Plaintiff's or the Class's biometric data when the initial purpose for collecting or obtaining such data has been satisfied or within three years of the individual's last interaction with the company.

73.    On behalf of himself and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

**SECOND CAUSE OF ACTION**
**Violation of 740 ILCS § 14/15(b): Failure to Obtain Informed Written Consent and Release**
**Before Obtaining Biometric Identifiers or Information**

74.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

75.     BIPA requires companies to obtain informed written consent from individuals before acquiring their biometric data. Specifically, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information unless [the entity] *first*: (1) informs the subject...in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject...in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; *and* (3) receives a written release executed by the subject of the biometric identifier or biometric information..." 740 ILCS 14/15(b) (emphasis added).

76.     Defendants fail to comply with these BIPA mandates.

77.     Each Defendant qualifies as a "private entity" under BIPA. *See* 740 ILCS § 14/10.

78.     Plaintiff and the Class are individuals who have had their "biometric identifiers" collected and/or obtained by each Defendant (in the form of their handprints), as explained in detail in Sections II and III, *supra. See* 740 ILCS § 14/10.

79.     Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS § 14/10.

80.     Defendants systematically and automatically collected, used, stored and disseminated Plaintiff's and the Class's biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS 14/15(b)(3).

81.     Defendants did not inform Plaintiff and the Class in writing that their biometric identifiers and/or biometric information were being collected, stored and used, nor did Defendants inform Plaintiff and the Class in writing of the specific purpose(s) and length of term for which their biometric identifiers and/or biometric information were being collected, stored, and used as required by 740 ILCS 14/15(b)(1)-(2).

82.     By collecting, storing, and using Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Defendants violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in BIPA. *See* 740 ILCS 14/1, *et seq.*

83.     On behalf of himself and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

**THIRD CAUSE OF ACTION**
**Violation of 740 ILCS § 14/15(d): Disclosure of Biometric Identifiers and**
**Information Before Obtaining Consent**

84.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

85.     BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for that disclosure. *See* 740 ILCS 14/15(d)(1).

86.     Defendants fail to comply with this BIPA mandate.

87.     Each Defendant qualifies as a "private entity" under BIPA. *See* 740 ILCS § 14/10.

88.     Plaintiff and the Class are individuals who have had their "biometric identifiers" collected and/or obtained by each Defendant (in the form of their handprints), as explained in detail in Sections II and III, *supra. See* 740 ILCS § 14/10.

89.     Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS § 14/10.

90.     Defendants systematically and automatically disclosed, redisclosed, or otherwise disseminated Plaintiff's and the Class's biometric identifiers and/or biometric information without first obtaining the consent required by 740 ILCS 14/15(d)(1).

91.     By disclosing, redisclosing, or otherwise disseminating Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Defendants violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in BIPA. *See* 740 ILCS 14/1, *et seq.*

92.     On behalf of himself and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with BIPA's requirements for the collection, storage, use and dissemination of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS § 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3).

## PRAYER FOR RELIEF

Wherefore, Plaintiff Chris Williams respectfully requests that this Court enter an Order:

A.  Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Chris Williams as Class Representative, and appointing Stephan Zouras, LLP, as Class Counsel;

B.  Declaring that each Defendant's actions, as set forth above, violate BIPA;

C.  Awarding statutory damages of $5,000 for *each* intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for *each* negligent violation of BIPA pursuant to 740 ILCS 14/20(1);

D.  Declaring that each Defendant's actions, as set forth above, were intentional and/or reckless;

E.  Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including an Order requiring Defendants to collect, store, use and disseminate biometric identifiers and/or biometric information in compliance with BIPA;

F.  Awarding Plaintiff and the Class their reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3);

G.  Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and,

H.  Awarding such other and further relief as equity and justice may require.


Date:   October 22, 2019            Respectfully Submitted,

                                    */s/ James B. Zouras*

                                    James B. Zouras
                                    Ryan F. Stephan
                                    Catherine T. Mitchell
                                    **STEPHAN ZOURAS, LLP**
                                    100 N. Riverside Plaza, Suite 2150
                                    Chicago, Illinois 60606
                                    312.233.1550
                                    312.233.1560 *f*
                                    jzouras@stephanzouras.com
                                    rstephan@stephanzouras.com

cmitchell@stephanzouras.com
Firm ID: 43734

**ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

I, the attorney, hereby certify that on October 22, 2019, I electronically filed the attached with the Clerk of the Court using the ECF system which will send such filing to all attorneys of record.

*/s/ James B. Zouras*

# Exhibit B



**SHERIFF'S OFFICE OF COOK COUNTY**
**AFFIDAVIT OF SERVICE**

| | | | | |
|---|---|---|---|---|
| **CASE NUMBER:** 2019CH09286 | **SHERIFF NUMBER:** 50006990 | **MULT. SER.:** 2 | **DOC. TYPE:** CHAN | |
| **DIE DATE:** 11/16/2019 | **RECEIVED DATE:** 11/04/2019 | **FILED DATE:** 10/22/2019 | **DIST:** 76 | |

| | |
|---|---|
| **DEFENDANT:** JACKSON PARK SLF | **PLAINTIFF:** WILLIAMS, CHRISTOPHER |
| **ADDRESS:** 4105 Oakton | **ATTORNEY:** STEPHAN ZOURAS LLP |
| **CITY:** Skokie | **ADDRESS:** 4105 N Riverside Dr 2150 |
| **STATE:** IL  **ZIP CODE:** 60076 | **CITY:** CHICAGO |
| **ATTACHED FEE AMT:** | **STATE:** IL  **ZIP CODE:** 60606 |
| **SERVICE INFORMATION:**  R/A: Elchanan Finestone | |

**I CERTIFY THAT I SERVED THE DEFENDANT/RESPONDENT AS FOLLOWS:**

☐ **(1) PERSONAL SERVICE:** BY LEAVING A COPY OF THE WRIT/ORDER WITH THE DEFENDANT/RESPONDENT PERSONALLY, AND INFORMING DEFENDANT/RESPONDENT OF CONTENTS.

☐ **(2) SUBSTITUTE SERVICE:** BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT AT THE DEFENDANT'S USUAL PLACE OF ABODE WITH A FAMILY MEMBER OR PERSON RESIDING THERE, 13 YEARS OR OLDER, AND INFORMING THAT PERSON OF THE CONTENTS OF THE SUMMONS. ALSO, A COPY OF THE SUMMONS WAS MAILED TO THE DEFENDANT AT HIS OR HER USUAL PLACE OF ABODE ON THE  DAY OF _  20.

☐ **(3) UNKNOWN OCCUPANTS:** BY LEAVING A COPY OF THE SUMMONS AND COMPLAINT NAMING "UNKNOWN OCCUPANTS" WITH A PERSON OF THE AGE OF 13 OR UPWARDS OCCUPYING SAID PREMISE.

☒ **(4) CORP/CO/BUS/PART:** BY LEAVING THE APPROPRIATE NUMBER OF COPIES OF THE SUMMONS, COMPLAINTS, INTERROGATORIES, JUDGMENTS, CERTIFICATIONS AND NOTICES WITH THE REGISTERED AGENT, AUTHORIZED PERSON OR PARTNER OF THE DEFENDANT CORPORATION ____COMPANY____BUSINESS _____ PARTNERSHIP __

☐ **(5) PROPERTY RECOVERED:** NO ONE PRESENT TO RECEIVE ORDER OF COURT. ORDER POSTED IN PLAIN VIEW.

☐ **(6) S.O.S/D.O.I.:** BY LEAVING THE SUMMONS AND COMPLAINT WITH THE SECRETARY OF THE STATE/DIRECTOR OF INSURANCE OF THE STATE OF ILLINOIS, AN AGENT OF SAID DEFENDANT LISTED ABOVE. ANY AGENT OF SAID CORPORATION NOT FOUND IN THE COUNTY OF COOK.

☐ **(7) CERTIFIED MAIL**
**\*\*\*\* COMPLETE THIS SECTION IF WRIT IS A THIRD PARTY CITATION/GARNISHMENT \*\*\*\***

☐ **(8)** AND BY MAILING ON THE ___ DAY OF _____ 20 _____ A COPY OF THE THIRD PARTY GARNISHMENT/CITATON SUMMONS AND NOTICE TO THE JUDGMENT DEBTOR'S LAST KNOWN ADDRESS AS INDICATED IN THE NOTICE WITHIN (2) BUSINESS DAYS OF SERVICE UPON GARNISHEE/THIRD PARTY DEFENDANT.

**THE NAMED DEFENDANT WAS NOT SERVED FOR THE GIVEN REASON BELOW:**

| | | |
|---|---|---|
| ☐ (01) NO CONTACT | ☐ (05) WRONG ADDRESS | ☐ (09) DECEASED |
| ☐ (02) MOVED | ☐ (06) NO SUCH ADDRESS | ☐ (10) NO REGISTED AGENT |
| ☐ (03) EMPTY LOT | ☐ (07) EMPLOYER REFUSAL | ☐ (11) OUT OF COOK COUNTY |
| ☐ (04) NOT LISTED | ☐ (08) CANCELLED BY PLAINTIFF ATTY | ☐ (12) OTHER REASON (EXPLAIN) |

**EXPLANATION:**

| | | |
|---|---|---|
| **WRIT SERVED ON:**  SAMANTHA PITCHFORD | | **ATTEMPTED SERVICES** |
| **SEX:** F  **RACE:** BL  **AGE:** 30 | | Date  Time  Star # |
| **THIS** 14 **DAY OF** November 20 19 | | 11/10/2019  20:20:00  # 10959 |
| **TIME:** 10:40 AM | | |

THOMAS J. DART,
SHERIFF, BY: /S/  O'BRIEN, RICHARD #10483  , DEPUTY

Page 1 of 2



**SHERIFF'S OFFICE OF COOK COUNTY**
**AFFIDAVIT OF SERVICE**

**CASE NUMBER:** 2019CH09286    **SHERIFF NUMBER:** 50006990    **MULT. SER.:** 2    **DOC. TYPE:** CHAN

**DIE DATE:** 11/16/2019    **RECEIVED DATE:** 11/04/2019    **FILED DATE:** 10/22/2019    **DIST:** 76

| Date | Time | Star # |
|------|------|--------|
|      |      |        |

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
10/24/2019 1:18 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH09286

7094362

FILED DATE: 10/24/2019 1:18 PM    2019CH09286

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| Summons - Alias Summons | (08/01/18) CCG 0001 A |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## CHANCERY DEPARTMENT

Christopher Williams, et al

v.

Jackson Park Supportive Living Facility, LLC
and Jackson Park SLF, LLC

Case No.     2019CH09286

☑ **SUMMONS**   ☐ **ALIAS SUMMONS**

To each Defendant:     **Registered Agent: Elchanan Finestone**

**4105 Oakton St., Skokie, Illinois 60076**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in th complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Summons - Alias Summons**          **(08/01/18) CCG 0001 B**

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.**

Atty. No.: 43734

Atty Name: James B. Zouras

Atty. for: Stephan Zouras LLP

Address: 100 N. Riverside Plaza

City: Chicago

State: IL    Zip: 60606

Telephone: 3122331550

Primary Email: jzouras@stephanzouras.com

Witness:     10/24/2019 1:18 PM DOROTHY BROWN

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

FILED DATE: 10/24/2019 1:18 PM   2019CH09286

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 2 of 3

FILED DATE: 10/24/2019 1:18 PM  2019CH09286

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

- ⦿ Richard J Daley Center
  50 W Washington
  Chicago, IL 60602

- ○ District 2 - Skokie
  5600 Old Orchard Rd
  Skokie, IL 60077

- ○ District 3 - Rolling Meadows
  2121 Euclid
  Rolling Meadows, IL 60008

- ○ District 4 - Maywood
  1500 Maybrook Ave
  Maywood, IL 60153

- ○ District 5 - Bridgeview
  10220 S 76th Ave
  Bridgeview, IL 60455

- ○ District 6 - Markham
  16501 S Kedzie Pkwy
  Markham, IL 60428

- ○ Domestic Violence Court
  555 W Harrison
  Chicago, IL 60607

- ○ Juvenile Center Building
  2245 W Ogden Ave, Rm 13
  Chicago, IL 60602

- ○ Criminal Court Building
  2650 S California Ave, Rm 526
  Chicago, IL 60608

### Daley Center Divisions/Departments

- ○ Civil Division
  Richard J Daley Center
  50 W Washington, Rm 601
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Chancery Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Domestic Relations Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Civil Appeals
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Criminal Department
  Richard J Daley Center
  50 W Washington, Rm 1006
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ County Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Probate Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Law Division
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- ○ Traffic Division
  Richard J Daley Center
  50 W Washington, Lower Level
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

# Exhibit C

# AGREEMENT

Between

## UNITED FOOD & COMMERCIAL WORKERS
## INTERNATIONAL UNION
## LOCAL 1546

And

## JACKSON PARK SUPPORTIVE LIVING FACILITY, LLC

June 1, 2014 - May 31, 2017

**A G R E E M E N T**

This AGREEMENT and Labor Contract has been made and entered into as of the first (1st) day of June 2014, between Jackson Park Supportive Living Facility, LLC (herein collectively called the "Employer") and Local 1546, affiliated with the UFCW International Union (hereinafter collectively called the "Union").

Whereas, the parties desire to establish and maintain a united cooperative action between the Employer and the employees in order to promote harmonious industrial relations:

Now, therefore, in consideration of the mutual covenants and agreements herein contained, the parties agree as follows:

### ARTICLE I - RECOGNITION

1.1     The Employer agrees to recognize the Union as the sole collective bargaining agent for all the employees classified as all full-time and regular part-time; Housekeeping Aides, Kitchen Aides, Laundry Aides, Assistant Cooks, Certified Nurses Aides, and Activity Aides, excepting all other job classifications not specifically recognized in this section including but not limited to Registered Nurses, Licensed Practical Nurses, Maintenance Employees, Supervisors and excluding Casual (PRN) any other classifications not included in the bargaining unit as set forth in the Certification of Bargaining Representatives for Jackson Park Supportive Living Facility LLC.  Also excluded from bargaining unit one (1) head cook or one (1) dietary manager, but in no instance shall there be both in any one facility who may perform bargaining unit work.

1.2     The Employer agrees not to enter into any agreement or contract with its employees, either individually or collectively, which conflicts with any of the provision of this Agreement.

### ARTICLE II - UNION SECURITY

2.1     The following employment condition shall be effective: It shall be a condition of employment that all employees of the facility covered by this Agreement who are members of the Union in good standing on the execution date of this Agreement shall remain members in good standing, and those who are not members on the execution date of this Agreement shall, on the thirtieth (30th) day following the execution date of this

1

Agreement, become and remain members in good standing in the Union as provided for in Section 8(a) (3) of the Act. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its execution date shall, on the thirty-first (31st) day following the beginning of such employment, become and remain members in good standing in the Union. The Employer may secure new employees from any source whatsoever.

New full time employees shall be on a sixty (60) day probationary trial period and new part-time employees shall be on a ninety (90) day probationary trial period and may be discharged during the probationary time without just cause and without recourse to the grievance procedure. Upon completion of the probationary time, his/her seniority shall revert back to the beginning date of his/her employment. There may be an extension of thirty (30) days to this probationary period by mutual agreement to enable the Employer to evaluate the employee. Upon completion of this probationary period, seniority shall revert back to the date of hire.

2.2 The Company shall pay said person so employed during the period said person is not a member of the Union at the regular Union wage provided for in this Agreement and shall in all other respects require said person to work under and live up to all provisions of this Agreement.

2.3 **Checkoff** The Employer agrees to deduct Union dues and fees upon written authorization by an employee, in accordance with the provisions of the Labor Management Relations Act of 1947, and remit the same to the Union along with a list of individuals for whom the deductions were made. Dues will be checked off on a monthly basis in advance. The Employer agrees to notify the Local Union when new employees are hired.

2.4 (A) **Active Ballot Club (A.B.C.)** The Employer agrees to honor and transmit to the Union, contribution deductions to the United Food & Commercial Workers International Union Active Ballot Club from employees who are union members and who sign deduction authorization cards. The deductions shall be in the amounts and with the frequency specified on the political contribution authorization cards; however, such deductions shall be remitted in conjunction with regular monthly dues deductions. While the deductions will be remitted at the same time of the regular monthly dues deductions, such payment shall be in the form of a separate check from the regular monthly dues deductions. When

2

the Employer remits the deduction to the United Food & Commercial Workers International Union Active Ballot Club the Employer shall include a list of individuals for whom the deductions were made.

2.4(B) **Credit Union** The Company agrees to make deductions from the wages of Union members who are on direct deposit and to pay such amounts to the Local 1546 Credit Union, when authorized in writing to do so by an individual employee covered by this Agreement, and such authorization may be canceled by sending written notice to the Company. Any authorization of deductions under this Section shall be considered automatically canceled upon transfer of an employee member.

2.5 Authorized Union representatives shall be allowed reasonable access to all bargaining unit work areas upon notice to the Administration to insure that the terms and conditions of this Agreement are being complied with. Such permission shall not be unreasonably withheld.

2.6 The Union shall indemnify and save the Company harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by the purpose of complying with Section 2.3, 2.4 (A) and 2.4 (B).

## **ARTICLE III - MANAGEMENT RIGHTS**

3.1 Management of the Business, the control of the premises and direction of the working force are vested exclusively in the Employer subject to the provision of this Agreement. The right to manage includes, but is not limited to the following: suspend or discharge for just cause; assign and supervise employees to determine and change starting times, quitting times, and shifts, and the number of hours to be worked; to determine staffing patterns; scheduling of days off; to determine policies and procedures with respect to resident care; to determine or change the methods and means by which its operation is or ought to be carried on; to set reasonable work standards; to determine the size, location of the Employer's Business; to extend or curtail, and to terminate (with proper notice for an opportunity to negotiate) the operations of the Employer to reduce the size of the work force through layoffs; to introduce new and improved methods or facilities; and to change existing methods or facilities and the right to sub-contract work.

The Employer has and retains the powers, functions, rights and authority it would have, but for the signing of this Agreement, except those specifically abridged or modified by the express provisions of this Agreement, provided, however, that such powers, functions, rights, and authority shall not be enforced or exercised contrary to or inconsistent with the provisions of this Agreement.

## ARTICLE IV - MAINTENANCE OF STANDARDS

4.1    It is agreed that this Agreement and Labor Contract shall provide for all the wages and benefits affecting the employees covered by this Agreement.    Unless specifically provided for, there shall be no other wages, benefits or working conditions provided to the Union or the employees.

4.2    It is agreed that the Company will not modify, alter, add to, withdraw or inject any new plan of an economic nature covering wages or other benefits affecting the employees covered by this Agreement without notifying the Union prior to execution.

## ARTICLE V - NO DISCRIMINATION

5.1    There shall be no discrimination against any employee because of Union affiliation or because of or based upon race, color, religion, sex, national origin, age or disability.

## ARTICLE VI - UNION REPRESENTATION

6.1    The Employer recognizes the right of the Union to select from his employees who are members of the Union, Union stewards to handle such Union business at the Employer's premises where they are employed, as may from time to time be delegated to them by the Union, in connection with this collective bargaining relationship.    The name of such Union stewards shall be furnished in writing to the Employer, and any change in stewards shall be reported to the Employer in writing.

6.2    The authority of Union stewards so designated by the Union shall be limited to, and shall not exceed the following duties and activities:

(a)    The investigation and presentation of grievances after first securing permission from the supervisors of the parties involved in said grievances; keeping the time

4

spent on grievances to a reasonable minimum; and conduct such activities so that they will not interfere with resident care.

(b) The transmission of such messages and information which shall originate with and are authorized by the Local Union or its officers, provided such messages and information a.) have been reduced to writing, or b.) if not reduced in writing, are of a routine nature and do not involve work stoppages, slow-downs, refusals to handle goods, or any other interference with the Employer's business.

(c) Investigation and presentation of grievances by the Union steward shall occur during non-working time.

6.3 Union stewards have no authority to take strike action, or any other action interrupting the Employer's business, except as authorized by official action of the Union. The Company shall have the authority to impose proper discipline including discharge, in the event the steward has taken unauthorized strike action, slow-down, or work stoppages in violation of this Agreement.

## ARTICLE VII - UNION AFFILIATION

7.1 The Company agrees that there shall be no discrimination against any employee because of Union membership or lawful Union activity.

7.2 It is agreed that an employee of the Company, upon being elected or appointed to office in the Union, shall be granted a leave of absence for a period of up to six (6) months, and upon expiration of such leave, shall be reinstated in a similar position as that held when granted leave of absence.

## ARTICLE VIII - WORKWEEK, SCHEDULES AND OVERTIME

8.1 The provisions of this Section are intended to provide the basis for calculating overtime pay and shall not be construed as a guarantee of hours of work per day or days of work per week or pay in lieu thereof or as a limitation upon maximum hours per day or per week which may be required.

8.2     Time and one-half (1½) the regular straight-time hourly rate will be paid for all hours worked: a.) In excess of eight (8) hours worked in any workday; b.) In excess of eighty (80) hours worked in any two (2) week payroll period.

Full-time Employees as stated in Article XII sec. 12.1, that work an Eleventh Day in a two (2) week pay roll period and complete all eleven (11) days without being late or absent for any reason will be paid time and one half from the start of their shift.(Example, employee works his ten (10) regular shifts and works an eleventh shift would be paid seventy-five (75) hours at straight time and seven and one-half (7½) hours at time and one half (1½).)

8.3     There shall be no pyramiding or duplication of overtime rates. Hours compensated for at overtime rates under one provision of this Agreement shall be excluded as hours worked in computing overtime under any other provision. If two or more provisions requiring the payment of overtime rates are applicable, the most favorable to the employee shall apply.

8.4     Overtime must be approved by the supervisor prior to working overtime. Employees desiring to work overtime shall indicate this desire and their availability, in writing, to the Employer. A blank schedule shall be posted at the beginning of each month for employees to request certain days they are available to work overtime. When overtime hours become available, the Employer shall offer those hours to the most senior employees in the job classification, who have indicated their desire, first. When it is necessary for the Employer to assign overtime, those hours shall be assigned to the least senior employees first. Further, available hours will be offered to current employees before the Employer resorts to outside-agency staffing. If all of the above steps have been exhausted, management may then assign overtime, in reverse seniority.

8.5     An employee may request a transfer from one shift to another. When a transfer from one shift to another becomes necessary, the principle of seniority and ability shall apply.

An employee may request, in writing, a continuing preference of shift. The Employer shall take all reasonable means to transfer employees to their preferred shift. An employee with greater seniority may be transferred if he or she had previously indicated their desire for such a transfer.

6

8.6    Work schedules shall be posted at least five (5) days prior to the start of the work period. If the Employer makes a change in the work schedule of any individual employee, five (5) days' notice of the change in the work schedule of the individual employee shall be given by the Employer to the individual employee, except in emergencies or to provide coverage for absent employees.

8.7    Schedules shall provide employees with twelve (12) hours' rest between shifts, except in emergencies or to provide coverage for absent employees.

8.8    An employee reporting to work at his/her regularly scheduled starting time, shall receive a minimum of four (4) hours' of work for that day or, in lieu thereof, four (4) hours' pay.

8.9    Employees who are called in to work outside their regularly scheduled work shifts, excluding in-service meetings, shall receive a minimum of four (4) hours' pay or pay for hours actually worked, whichever is greater.

## ARTICLE IX - LAYOFF AND NOTICE

9.1    Layoffs will be guided by the principles of seniority, by status (full-time/part-time) and by job classification. One (1) full-time employee from each job classification may elect to become a part-time employee to avoid a layoff. If a full-time position becomes available, the last full-time employee should be offered the position first. A senior employee from one job classification may bump into another job classification, provided the employee can work the hours of that employee and perform the duties of that employee either has the ability to perform the duties of that job, or in the judgment of the management can perform those duties with a reasonable amount of training. Any employee who accepts such a position shall receive a rate of pay equal to that of a similarly situated employee or the rate of the next highest employee based on his/her seniority. No employee will be allowed into a position that requires a license or a certificate. A five (5) day notice of layoff will be given to any effected employee before such layoff begins. In the event that notice is not given on time, the effected employee will receive, if scheduled, up to five (5) days pay in lieu of notice. No notice is required for employees within their probationary period. Employees on layoff shall have recall rights for six (6) months or their length of service, whichever is less.

## ARTICLE X - HIRING

10.1    The Employer may secure employees through the employment offices of the Union, for which services there shall be no charge either to the Employer or to the employees. At all times the right of hiring shall remain with the Employer.

## ARTICLE XI - HEALTH & WELFARE BENEFIT

11.1    After June 1, 2006, for employees who choose to enroll in a Health and Welfare Insurance Plan, the Company shall contribute the following percentage of the Health Insurance cost for single person coverage:

For employees with more than one (1) year of full-time employment, the Company shall contribute fifty percent (50%) towards the total cost for single coverage of the Health Insurance premium upon submission of proof of enrollment.

11.2    If the Employer makes a change to a new plan during this Agreement for reasons other than any mandated State or Federal Healthcare requirement, the nature, type, and extent of coverage must be at least equal to the coverage currently being offered. The Company will maintain the fifty (50%) percent of the cost for single coverage for the life of this contract. The Company will inform and meet with the Union prior to any change.

11.3    Should the Company have to change health care plans as a result of any federal or state required health care mandates and upon the implementation of National Healthcare (ACA) and the Employer's requirement to provide healthcare coverage, the Employer agrees to maintain a Company sponsored private health insurance program for all regular full-time employees who meet the requirements for eligibility under such program. The program is as set forth in the plan documents (as those documents may from time to time be amended and which are hereby incorporated by reference into and made a part of this Agreement).

11.4    The Employer shall have the right to, among other rights as spelled out in the plan documents, change carriers, change administrators, change funding methods, insure, or self-insure all or any part of the benefits provided. The Plan offered to union employees will be the same plan as offered to non-union employees and union employees will be treated the same as non-union employees for the purposes of this Article.

8

Before any new health care plan goes into effect the Company will inform and meet with the union at least sixty (60) days before the plan goes into effect. The Company also agrees to meet with all affected employees at least thirty (30) days prior to the change of plans to explain to the employee the changes with the new plan, the cost, optional coverage's and his/her employee requirements under the law.

## ARTICLE XII - FULL-TIME AND PART-TIME EMPLOYEES

12.1    The basic work week for a full-time employee is five (5) days at seven and one-half (7½) hours per day. Sunday thru Saturday.

12.2    A regular part-time employee is an employee who is regularly schedule to work less than thirty-seven and one-half (37½) hours but more than fifteen (15) hours per week, Sunday thru Saturday.

12.3    A regular part-time that works thirty-seven and one-half (37½) hours or more for four (4) consecutive weeks will become a full-time employee at the start of the next payroll period.

12.4    A Casual employee is an employee that is scheduled to work fifteen (15) hours or less per week and is a non-union employee. The use of casual employees is not intended to limit the opportunity of regular full and part-time employees to be scheduled for regular straight-time hours.

## ARTICLE XIII - LUNCH PERIOD AND REST PERIODS

13.1    Employees working a shift of more than four (4) hours will normally be allowed a thirty (30) minute lunch period without pay.  No lunch period will be provided for employees working a shift of four (4) hours or less.

13.2    Employees shall receive two (2) fifteen (15) minute uninterrupted rest periods, except in emergencies, without loss of pay, in any one workday.  The rest periods shall be scheduled approximately within fifteen (15) minutes of the employees' half (½) shifts. Employees working four (4) hours but less than seven (7) hours shall be entitled to one (1) rest period.  Employees assigned to work overtime for a continuous period of four (4)

9

hours or more after the end of their regular shift will be granted an additional rest period of fifteen (15) minutes during the overtime period.

13.3   The Employer will furnish an "Employees Only" lunchroom.

## ARTICLE XIV - SENIORITY

14.1   Seniority shall be defined as the length of continuous employment with the Employer. Under this definition, the last employee hired shall be the first to be laid off, or reduced in hours, provided the remaining employees can satisfactorily perform the available work. Temporary absence from work, as set forth in this Agreement, shall not break seniority. Seniority may be broken only by:

(a)   quit;

(b)   justifiable discharge;

(c)   if an employee has been continuously laid off for a period of more than six (6) months;

(d)   failure by the employee to notify the Employer within three (3)days of recall that he/she will return to work;

(e)   failure of an employee to return to work, after recall from layoff within five (5) days from date of notification of recall;

(f)   failure of an employee to return to work in accordance with the terms of a leave of absence.

Recall to work shall be governed by the same principles of seniority.

14.2   The Employer shall give written notice of available vacancies within the bargaining unit by posting upon an appropriate bulletin board a notice that a job vacancy exists, setting forth therein the job category and schedule of work hours. This notice shall be posted for five (5) calendar days, but during these five (5) calendar days the Employer may temporarily assign any employee to fill this vacancy. The Employer shall fill vacancies, in the first instance, from person bidding who are in the same job category, irrespective or whether full-time or part-time employees. If the vacancy is not filled in this fashion, the bids of employees in job categories other than the one in which the vacancy exists shall next be considered.

The Employer shall fill vacancies on the basis of reasonable qualifications and the ability to having the greatest seniority shall fill the vacancy.

14.3    An employee from a different job category shall be a probationary employee in his/her new job category for a period of ninety (90) days. During this probationary period, the Employer shall have the right to determine the qualification of the employee in the new job classification, but the employer shall not exercise this power of judgment in an arbitrary or capricious manner.

In the event an employee bidding on a new job category is found not to be qualified, his/her position.

14.4    Upon the Union's request, the Employer shall furnish the Union with a current seniority list covering all names, rates of pay, dates of hire and classification of each employee.

14.5    When an employee is promoted or transferred from a bargaining unit job to a position outside the unit, he/she shall continue to accumulate seniority for six (6) months and shall accumulate none thereafter. If he/she is transferred back to the bargaining unit, he/she shall be entitled to a job in accordance with such accumulated seniority and ability as if he/she had been on layoff. An employee who is employed by the Employer originally in a supervisory position outside the bargaining unit shall not accumulate seniority while working as a supervisor.

## ARTICLE XV - RATES OF PAY

Job classifications in existence on the date of this Agreement, the rates of pay and progression schedules applicable thereto and the effective dates of said rates are set forth in Exhibit A, attached hereto and made a part hereof.

## ARTICLE XVI - HOLIDAYS

16.1    The following days shall be recognized as holidays under this Agreement for all employees who have completed their probationary period: New Year's Day, Martin Luther King Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day. After one (1) years of employment, full-time employees shall have their birthday as a paid holiday.

11

Part time employees that have completed his/her probationary trial period will receive a pro-rated holiday pay based on the employee's average hours paid. This average will be based on the past eight (8) weeks. Part-time employees are not eligible for birthday pay.

16.2 To be eligible for holiday pay, an employee must satisfy all of the following requirements:

    (a) He/she must have worked his/her full scheduled workday before and his/her full scheduled workday following the holiday unless excused by the Employer for good cause;

    (b) He/she must have worked in the two (2) week payroll period in which the holiday occurs unless on vacation or sick leave. If the employee is on sick leave, then the employee must return to active duty prior to the date of the holiday.

16.3 Holiday work shall be scheduled by the Employer and shall be rotated among all employees who volunteer for holiday work. Should an insufficient number of employees volunteer, the Employer shall have the right to schedule from the least senior in inverse order. Senior employees shall have the right to the holiday schedule with the greatest number of hours.

16.4 If a holiday falls within an employee's scheduled vacation, such employee, if otherwise eligible, shall, at the request of the employee and at the option of the Employer, be paid Holiday pay in addition to his/her vacation pay, or granted an additional day of vacation.

16.5 An employee scheduled to work on a holiday but who fails to report shall not be eligible for holiday pay unless excused by the Employer for good cause.

16.6 All employees who work on a Holiday shall be paid the equal number of hours as worked on the holiday not to exceed one (1) shifts' pay at straight-time as holiday pay or their individual pro-rata if they do not work on holiday. Such holiday pay will not exceed eight (8) hours of pay. Time work over eight (8) hours will be paid in accordance with Section 8.2

### ARTICLE XVII - VACATIONS

17.1  Full-time employees shall be granted vacations with pay based upon their years of continuous service with the following schedule:

5 days per year ..................................................................................after 1 year of service
10 days per year ............................................................................ after 3 years of service
15 days per year ............................................................................ after 5 years of service
20 days per year ........................................................................... after 10 years of service

Employees shall have the right to have seven (7) consecutive days off for a vacation.

Example:  After one (1) year of service; five (5) paid days off plus two (2) regular days off.

17.2(A)For the calendar year of 2014, regular part-time employees working a minimum of twenty (20) hours per week, after three (3) years of service, earn one (1) week of vacation time paid at twenty (20) hours.  Part-time employees cannot use their vacation time as single days off.

Effective January 1, 2015 and starting with the employee's anniversary date, part-time employees shall be granted vacations with pay based upon their years of continuous service with the following schedule:

5 days per year ..................................................................................after 1 year of service
10 days per year ............................................................................ after 3 years of service
15 days per year ............................................................................ after 8 years of service

17.2(B)All Union employees shall receive, for each week of vacation, pay equal to their normal week's base pay.  Vacation pay will be computed based upon the rate received by the employee as of the time the vacation is taken.  Employees who are regularly scheduled to work shall receive, for each week of vacation, benefit pay based upon the total number of regular hours worked the previous year divided by twenty-six (26) two (2) week pay periods.  Regular hours include all compensated straight-time hours.

17.3    An employee's vacation eligibility year is the twelve (12) month period immediately preceding the anniversary of his/her last date of hire and is the period in which he/she earns his/her vacation.

17.4    Employees must take their vacation during the twelve (12) month period following their vacation eligibility year.  Employees who have worked at least six (6) months past their anniversary date and resign will be entitled to receive vacation pay in lieu of vacation to the extent that such vacation pay has been earned on the date of termination of employment.

17.5    An employee will receive vacation pay on the last established payday prior to the start of the vacation.  Vacations earned must be taken; however, if the Employer requests and the employee agrees to work in lieu of vacation, he/she shall be paid his/her regular pay plus earned vacation pay.

17.6    All employees can take their vacations by seniority and mutual agreement with the Employer. A vacation schedule shall be posted by Department, no later April 1st each year.  Vacations shall be granted by Seniority and by Department no later than May 15th each year.

### ARTICLE XVIII - GRIEVANCE PROCEDURE

18.1    Subject to the provisions of Section 18.2, any grievance by the Union or any employee against the Jackson Park Supportive Living Facility with respect to the interpretation or application of, or compliance with, this Agreement or with respect to disciplinary action taken with any employee, including the reasonableness of any Employer rules of conduct or regulations under which the disciplinary action may have been taken, shall be settled in the following manner:

   (a)    The Union representative involved shall orally discuss the grievance with the Director. The Director shall reply orally to the grievance.

   (b)    If the matter is not satisfactorily adjusted in step (a) the grievance shall be reduced to writing and submitted to the Director of the facility.  The written grievance shall contain a brief statement of the nature of the grievance and shall state the relief sought. The Director or his/her designee shall reply to the grievance within seven (7) days.

14

18.2   When in the judgment of either party arbitration is necessary, either party may initiate same by notifying the other party in writing that it has invoked the arbitration provisions of the Contract and that it has requested the Federal Mediation and Conciliation Service to submit a panel of arbitrators to the parties. In no event shall arbitration be initiated earlier than seven (7) days following mailing of the written grievance. The parties shall promptly proceed to select an arbitrator from the panel and proceed to arbitrate the grievance all in accordance with the rules of the Federal Mediation and Conciliation Service. The decision of the arbitrator shall be final and binding on the parties.

18.3   Expenses incurred in connection with the arbitration, to wit, fees of the Federal Mediation and Conciliation Service, the arbitrator's fees and expenses and rental of hearing room, if necessary, shall be shared equally by the parties.

18.4   All grievances except those hereinafter specified must be presented in the first step of the grievance procedure within seven (7) days, except for wage claims which shall be presented within a reasonable time, from the date the cause for the grievance occurs or the employee or the Union has knowledge of the cause for the grievance, not to exceed 30 days.

18.5   Stewards selected by the Union will be permitted to discuss grievances with representatives in the appropriate steps of the grievance procedure during normal working hours without loss of pay, provided that such discussion shall not exceed a reasonable period of time and shall not interfere with resident care.

### **ARTICLE XIX - NO STRIKE -NO LOCKOUT**

19.1   The Union will not cause or permit its members to cause, and will not sanction in any way, any strike, slowdown, picketing, or other curtailment, restriction, or interference with any Employer functions or operations for any reason whatsoever, and no employee will participate in any such activities during the term of this Agreement or any extension thereof.

19.2   The Employer agrees that it will not lock out its employees during the term of this Agreement or any extension thereof.

## **ARTICLE XX - LEAVE OF ABSENCE**

20.1   Upon approval of the Employer, employees may be granted a leave of absence without pay for a period not to exceed ninety (90) days provided a written application is submitted to the Employer setting forth a good cause for the leave of absence and such leave does not interfere with the efficient operation of the department and provided further that may be extended by the Employer at the request of the employee for an additional period or periods of ninety (90) calendar days. Normally a leave of absence will not be granted during the first year of employment except for short duration in emergency circumstances.

20.2   Military leaves of absence and the re-employment right of employees who serve in the Armed Forces of the United States will be determined on the basis of applicable Federal Law.

20.3   <u>Injury or Illness Leave</u>   A leave of absence without pay of up to one (1) year shall be granted to employees unable to work because of injury or illness. The employee shall be reinstated to his/her previous classification if available upon furnishing the Employer with a physician's report certifying that he/she is capable of returning to work.

20.4   Employees on approved leaves of absence shall retain seniority, but shall not accrue other benefits during the leave of absence, except for the first sixty (60) calendar days of absence resulting from an accident occurring on the job.

20.5   <u>Funeral Leave</u>   Full-time employees shall be allowed up to three (3) days paid time off to make the necessary arrangements and to attend the funeral for the death of a current spouse, mother, father, child, stepchild, brother, sister and two (2) days with pay for grandparents (of the employee), grandchildren, current mother-in-law and current father-in-law. Part-time employees will be allowed to take the same time off, without pay.

20.6   **F.M.L.A:** The Company will comply with the Family Medical Leave Act. Eligible employees may take a family leave of absence (without pay) for a period of up to twelve (12) weeks, without loss of seniority or other rights.

Employees must comply with FMLA guidelines with regards to medical certification for leave of absence. If the employee has health insurance they must continue to pay their normal portion for up to twelve (12) weeks. After twelve (12) weeks the employee will receive Cobra notification to elect continuation of coverage on their own.

20.7    All employees requesting leave of absence for the birth or adoption of a child must adhere to the federal guidelines outlined by the FMLA act. Employees must apply for and supply medical certification regarding their maternity leave. Employees, if approved, will be granted up to twelve (12) weeks off without pay Employees must be employed for one (1) year and have worked at least 1,250 hours. However, if the employee has vacation, sick or personal Holidays they will be exhausted during the leave of absence. The employee must bring a medical release fro their doctor stating they are physically able to return to normal unrestricted duties. After twelve (12) weeks the employee will receive Cobra notification to elect continuation of coverage on their own.

## **ARTICLE XXI - GENERAL PROVISIONS**

21.1    The Employer will continue to make reasonable provisions for the safety of its employees during their hours of employment. Two (2) employees from the bargaining unit mutually agreed upon by the Employer and the Union shall serve on the Employer's safety Committee.

21.2    The Employer shall provide the employee's first uniform. Thereafter, the employees shall be responsible to provide their own uniforms. All employees shall maintain their own uniforms. If the Employer changes the uniforms, the Employer will provide two (2) free uniforms to each employee.

21.3    The Employer will make bulletin boards available for the use of the Union in suitable and sufficient non-public locations. The Union will be permitted to post on these bulletin boards notices of a non-controversial nature, copies to be submitted to the Director prior to posting. There shall be no distribution or posting by employees of advertising or political material, notices or kinds of literature on the Business property other than herein provided.

21.4    In the event any of the provisions of this Agreement shall be or become invalid or unenforceable by reason of any Federal or State Law now existing or hereinafter enacted, such invalidity or unenforceability shall not affect the remainder of the provisions hereof. The Company and the Union agree to meet within thirty (30) days following such a holding or determination for the purpose of negotiating a substitute clause to replace the provision found to be invalid.

21.5    Within a reasonable time after the giving of notice, the parties shall designate their representatives for the purpose of collective bargaining negotiations.

21.6    The Employer will provide for Vending Machines for the employee's use during breaks and lunch periods. Employees shall have a vending Committee.

21.7    Employees who work less than thirty-seven and one half (37½) hours per week shall receive benefits on a pro rata basis, using the formula in Section 17.1 of this Contract. One day of benefit shall be calculated by taking the one week average and dividing it by five (5). Part-time employees shall not be entitled to sick pay or death benefits, nor shall the Employer be obligated to make contributions to Health and Welfare coverage.

21.8    The Employer shall notify the Union of any discharge of any union employee, within seven (7) days stating the date of discharge and the reason. A phone call to the union office with the information will count as notification.

The Employer will utilize written warning notices along with individual counseling sessions. Copies of the written notices will be forwarded to the Union when requested.

It is mutually agreed by the Company and the Union that no warning notices need be given prior to discharge with just cause.

## ARTICLE XXII - SICK DAYS

22.1    Full-time employees will earn one (1) sick day for each two (2) months worked, for a total of six (6) days per year. New full-time employees are not entitled to take sick time during the first ninety (90) days. After the first ninety (90) days full-time employees earn sick time from date of hire. Part-time employees do not receive sick pay.

22.2    Full-time employees hired before May 31, 2009, will be paid for up to three (3) days of unused sick time. Payment will be received by January of the next year.

22.3    Full-time employees after May 31, 2009, that have five (5) or six (6) sick days left unused at the years end will be paid for one half (½) of the time. Payment will be received by January of the next year.

22.4    Employees who resign and give two (2) weeks notice will receive up to three (3) unused sick days with their last check.

Employees terminated for just cause shall not be paid out sick time.

## ARTICLE XXIII - SUCCESSORSHIP

In the event of any sale, purchase, merger, or other transaction affecting ownership of the Employer's business or ownership of the assets of the Employer's business, the Employer agrees to make known the existence of this Agreement and its terms and conditions to the other party prior to any such transaction. The Employer also agrees to provide the Union with the all contact information of the future owner or ownership group.

### ARTICLE XXIV -TERM OF AGREEMENT

24.1    This Agreement constitutes the entire agreement between the parties and concludes all collective bargaining negotiations for the term hereof. In as much as both parties have had a full opportunity to negotiate with respect to all matters relating to wages, hours, and all other terms and conditions of employment, neither party is under any duty to bargain with respect to any changes, modifications or additions to this Agreement to take effect during its term.

24.2    This Agreement shall become effective as of June 1, 2014, and shall remain in effect until May 31, 2017. It shall automatically renew itself from year to year thereafter unless either party shall give written notice to the other party not less than ninety (90) days prior to May 31, 2017, or any subsequent anniversary date thereafter, that it desires to modify or terminate this Agreement.

IN WITNESS WHEREOF, the parties hereto caused this Agreement to be executed by their duly authorized representatives the day and year first above written.

Signed this _____ 26th _____ day of ___June___ 20 14

**JACKSON PARK SUPPORTIVE LIVING FACILITY, LLC**

Signature

DAVE Murphy CEO
Print Name/Title

**UNITED FOOD & COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 1546**

Kenneth R. Boyd, President
International Vice President

Contract #036800

## EXHIBIT A

## WAGE INCREASES/LONGEVITY WAGES

Employees presently receiving, or who may hereafter receive, in excess of the above pay schedules shall not have their pay decreased because of provisions of this Contract.

The negotiated wage rates are to apply to all employees who are presently receiving, or who may hereafter receive, in excess of the above Contract brackets and rates.

### All employees covered by this agreement will receive the following wage increase:

**Effective at the start of the first full payroll period following May 31, 2014 will receive the following hourly wage increase:**

All Employees..............................................................................Thirty-five cents (.35¢) per hour

**All employees on the payroll as of May 31, 2014 will also receive the following one time signing bonus of:**

Employees with less than one (1) full year of service ................... One Hundred Dollars ($100.00)
Employees with more than (1) year of service ..............................Two Hundred Dollars ($200.00)
This one time bonus will be paid by June 30, 2014. The employee must be employed at the time of payment.

**Effective at the start of the first full payroll period following May 31, 2015 will receive the following hourly wage increase:**

Employees with less than one (1) full year of service .......................... Thirty cents (.30¢) per hour
Employees with more than (1) year of service ..............................Thirty-five cents (.35¢) per hour

**Effective at the start of the first full payroll period following May 31, 2016 will receive the following hourly wage increase:**

Employees with less than one (1) full year of service .......................... Thirty cents (.30¢) per hour
Employees with more than (1) year of service ..............................Thirty-five cents (.35¢) per hour

# Exhibit D

# AGREEMENT

## Between

## UNITED FOOD & COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL 1546

## And

## JACKSON PARK SLF LLC

## June 1, 2017 – May 31, 2020

# AGREEMENT

This AGREEMENT and Labor Contract has been made and entered into as of the first (1st) day of June 2017, between Jackson Park SLF LLC (herein collectively called the "Employer") and Local 1546, affiliated with the UFCW International Union (hereinafter collectively called the "Union").

Whereas, the parties desire to establish and maintain a united cooperative action between the Employer and the employees in order to promote harmonious industrial relations:

Now, therefore, in consideration of the mutual covenants and agreements herein contained, the parties agree as follows:

## ARTICLE I - RECOGNITION

1.1   The Employer agrees to recognize the Union as the sole collective bargaining agent for all the employees classified as all full-time and regular part-time; Housekeeping Aides, Kitchen Aides, Laundry Aides, Assistant Cooks, Certified Nurses Aides, and Activity Aides, excepting all other job classifications not specifically recognized in this section including but not limited to Registered Nurses, Licensed Practical Nurses, Maintenance Employees, Supervisors and excluding Casual (PRN) any other classifications not included in the bargaining unit as set forth in the Certification of Bargaining Representatives for Jackson Park SLF LLC.  Also excluded from bargaining unit one (1) head cook or one (1) dietary manager, but in no instance shall there be both in any one facility who may perform bargaining unit work.

1.2   The Employer agrees not to enter into any agreement or contract with its employees, either individually or collectively, which conflicts with any of the provision of this Agreement.

## ARTICLE II - UNION SECURITY

2.1   The following employment condition shall be effective: It shall be a condition of employment that all employees of the facility covered by this Agreement who are members of the Union in good standing on the execution date of this Agreement shall remain members in good standing, and those who are not members on the execution date of this Agreement shall, on the thirtieth (30th) day following the execution date of this

1

Agreement, become and remain members in good standing in the Union as provided for in Section 8(a) (3) of the Act. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its execution date shall, on the thirty-first (31st) day following the beginning of such employment, become and remain members in good standing in the Union. The Employer may secure new employees from any source whatsoever.

New full time employees shall be on a sixty (60) day probationary trial period and new part-time employees shall be on a ninety (90) day probationary trial period and may be discharged during the probationary time without just cause and without recourse to the grievance procedure. Upon completion of the probationary time, his/her seniority shall revert back to the beginning date of his/her employment. There may be an extension of thirty (30) days to this probationary period by mutual agreement to enable the Employer to evaluate the employee. Upon completion of this probationary period, seniority shall revert back to the date of hire.

2.2     The Company shall pay said person so employed during the period said person is not a member of the Union at the regular Union wage provided for in this Agreement and shall in all other respects require said person to work under and live up to all provisions of this Agreement.

2.3     **Checkoff**     The Employer agrees to deduct Union dues and fees upon written authorization by an employee, in accordance with the provisions of the Labor Management Relations Act of 1947, and remit the same to the Union along with a list of individuals for whom the deductions were made. Dues will be checked off on a monthly basis in advance. The Employer agrees to notify the Local Union when new employees are hired.

2.4 (A) **Active Ballot Club (A.B.C.)**  The Employer agrees to honor and transmit to the Union, contribution deductions to the United Food & Commercial Workers International Union Active Ballot Club from employees who are union members and who sign deduction authorization cards. The deductions shall be in the amounts and with the frequency specified on the political contribution authorization cards; however, such deductions shall be remitted in conjunction with regular monthly dues deductions. While the deductions will be remitted at the same time of the regular monthly dues deductions, such payment shall be in the form of a separate check from the regular monthly dues deductions. When

the Employer remits the deduction to the United Food & Commercial Workers International Union Active Ballot Club the Employer shall include a list of individuals for whom the deductions were made.

2.4(B) **Credit Union**    The Company agrees to make deductions from the wages of Union members who are on direct deposit and to pay such amounts to the Local 1546 Credit Union, when authorized in writing to do so by an individual employee covered by this Agreement, and such authorization may be canceled by sending written notice to the Company.  Any authorization of deductions under this Section shall be considered automatically canceled upon transfer of an employee member.

2.5    Authorized Union representatives shall be allowed reasonable access to all bargaining unit work areas upon notice to the Administration to insure that the terms and conditions of this Agreement are being complied with.  Such permission shall not be unreasonably withheld.

2.6    The Union shall indemnify and save the Company harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by the purpose of complying with Section 2.3, 2.4 (A) and 2.4 (B).

**ARTICLE III - MANAGEMENT RIGHTS**

3.1    Management of the Business, the control of the premises and direction of the working force are vested exclusively in the Employer subject to the provision of this Agreement. The right to manage includes, but is not limited to the following:  suspend or discharge for just cause; assign and supervise employees to determine and change starting times, quitting times, and shifts, and the number of hours to be worked; to determine staffing patterns; scheduling of days off; to determine policies and procedures with respect to resident care; to determine or change the methods and means by which its operation is or ought to be carried on; to set reasonable work standards; to determine the size, location of the Employer's Business; to extend or curtail, and to terminate (with proper notice for an opportunity to negotiate) the operations of the Employer to reduce the size of the work force through layoffs; to introduce new and improved methods or facilities; and to change existing methods or facilities and the right to sub-contract work.

The Employer has and retains the powers, functions, rights and authority it would have, but for the signing of this Agreement, except those specifically abridged or modified by the express provisions of this Agreement, provided, however, that such powers, functions, rights, and authority shall not be enforced or exercised contrary to or inconsistent with the provisions of this Agreement.

## ARTICLE IV - MAINTENANCE OF STANDARDS

4.1     It is agreed that this Agreement and Labor Contract shall provide for all the wages and benefits affecting the employees covered by this Agreement.    Unless specifically provided for, there shall be no other wages, benefits or working conditions provided to the Union or the employees.

4.2     It is agreed that the Company will not modify, alter, add to, withdraw or inject any new plan of an economic nature covering wages or other benefits affecting the employees covered by this Agreement without notifying the Union prior to execution.

## ARTICLE V - NO DISCRIMINATION

5.1     There shall be no discrimination against any employee because of Union affiliation or because of or based upon race, color, religion, sex, national origin, age or disability.

## ARTICLE VI - UNION REPRESENTATION

6.1     The Employer recognizes the right of the Union to select from his employees who are members of the Union, Union stewards to handle such Union business at the Employer's premises where they are employed, as may from time to time be delegated to them by the Union, in connection with this collective bargaining relationship.    The name of such Union stewards shall be furnished in writing to the Employer, and any change in stewards shall be reported to the Employer in writing.

6.2     The authority of Union stewards so designated by the Union shall be limited to, and shall not exceed the following duties and activities:

(a)     The investigation and presentation of grievances after first securing permission from the supervisors of the parties involved in said grievances; keeping the time

4

spent on grievances to a reasonable minimum; and conduct such activities so that they will not interfere with resident care.

(b) The transmission of such messages and information which shall originate with and are authorized by the Local Union or its officers, provided such messages and information a.) have been reduced to writing, or b.) if not reduced in writing, are of a routine nature and do not involve work stoppages, slow-downs, refusals to handle goods, or any other interference with the Employer's business.

(c) Investigation and presentation of grievances by the Union steward shall occur during non-working time.

6.3 Union stewards have no authority to take strike action, or any other action interrupting the Employer's business, except as authorized by official action of the Union. The Company shall have the authority to impose proper discipline including discharge, in the event the steward has taken unauthorized strike action, slow-down, or work stoppages in violation of this Agreement.

## ARTICLE VII - UNION AFFILIATION

7.1 The Company agrees that there shall be no discrimination against any employee because of Union membership or lawful Union activity.

7.2 It is agreed that an employee of the Company, upon being elected or appointed to office in the Union, shall be granted a leave of absence for a period of up to six (6) months, and upon expiration of such leave, shall be reinstated in a similar position as that held when granted leave of absence.

## ARTICLE VIII - WORKWEEK, SCHEDULES AND OVERTIME

8.1 The provisions of this Section are intended to provide the basis for calculating overtime pay and shall not be construed as a guarantee of hours of work per day or days of work per week or pay in lieu thereof or as a limitation upon maximum hours per day or per week which may be required.

8.2     Time and one-half (1½) the regular straight-time hourly rate will be paid for all hours worked: In excess of forty (40) hours in any one (1) week payroll week.

Full-time Employees as stated in Article XII sec. 12.1, that work an Eleventh Day in a two (2) week pay roll period and complete all eleven (11) days without being late or absent for any reason will be paid time and one half from the start of their shift.(Example, employee works his ten (10) regular shifts and works an eleventh shift would be paid seventy-five (75) hours at straight time and seven and one-half (7½) hours at time and one half (1½).)

8.3     There shall be no pyramiding or duplication of overtime rates.  Hours compensated for at overtime rates under one provision of this Agreement shall be excluded as hours worked in computing overtime under any other provision.  If two or more provisions requiring the payment of overtime rates are applicable, the most favorable to the employee shall apply.

8.4     Overtime must be approved by the supervisor prior to working overtime.  Employees desiring to work overtime shall indicate this desire and their availability, in writing, to the Employer.  A blank schedule shall be posted at the beginning of each month for employees to request certain days they are available to work overtime.  When overtime hours become available, the Employer shall offer those hours to the most senior employees in the job classification, who have indicated their desire, first. When it is necessary for the Employer to assign overtime, those hours shall be assigned to the least senior employees first.  Further, available hours will be offered to current employees before the Employer resorts to outside-agency staffing.  If all of the above steps have been exhausted, management may then assign overtime, in reverse seniority.

8.5     An employee may request a transfer from one shift to another.  When a transfer from one shift to another becomes necessary, the principle of seniority and ability shall apply.

An employee may request, in writing, a continuing preference of shift.  The Employer shall take all reasonable means to transfer employees to their preferred shift.  An employee with greater seniority may be transferred if he or she had previously indicated their desire for such a transfer.

8.6    Work schedules shall be posted at least five (5) days prior to the start of the work period. If the Employer makes a change in the work schedule of any individual employee, five (5) days' notice of the change in the work schedule of the individual employee shall be given by the Employer to the individual employee, except in emergencies or to provide coverage for absent employees.

8.7    Schedules shall provide employees with twelve (12) hours' rest between shifts, except in emergencies or to provide coverage for absent employees.

8.8    An employee reporting to work at his/her regularly scheduled starting time, shall receive a minimum of four (4) hours' of work for that day or, in lieu thereof, four (4) hours' pay, with exception in-service meetings or staff meetings for which they will be paid for time of attendance. If the employee is scheduled off on the date of an in-service or staff meeting the employee will be paid for time of attendance or one (1) hour whichever is greater.

8.9    Employees who are called in to work outside their regularly scheduled work shifts, excluding in-service meetings, shall receive a minimum of four (4) hours' pay or pay for hours actually worked, whichever is greater.

**ARTICLE IX - LAYOFF AND NOTICE**

9.1    Layoffs will be guided by the principles of seniority, by status (full-time/part-time and each treated the same) by job classification. One (1) full-time employee from each job classification may elect to become a part-time employee to avoid a layoff. If a full-time position becomes available, the last full-time employee should be offered the position first. A senior employee from one job classification may bump into another job classification, provided the employee can work the hours of that employee and perform the duties of that employee either has the ability to perform the duties of that job, or in the judgment of the management can perform those duties with a reasonable amount of training. Any employee who accepts such a position shall receive a rate of pay equal to that of a similarly situated employee or the rate of the next highest employee based on his/her seniority. No employee will be allowed into a position that requires a license or a certificate. A five (5) day notice of layoff will be given to any effected employee before such layoff begins. In the event that notice   is not given on time, the effected employee

will receive, if scheduled, up to five (5) days pay in lieu of notice. No notice is required for employees within their probationary period. Employees on layoff shall have recall rights for six (6) months or their length of service, whichever is less.

## ARTICLE X - HIRING

10.1    The Employer may secure employees through the employment offices of the Union, for which services there shall be no charge either to the Employer or to the employees. At all times the right of hiring shall remain with the Employer.

## ARTICLE XI - HEALTH & WELFARE BENEFIT

11.1    The Company agrees to maintain a Company offered Healthcare plan throughout the life of this contract and should the Company change plans during the life of the contract, the changes will be to a substantially equivalent plan. The Company will offer at least two levels of employee only coverage's. The Company agrees to notify and meet with the Union (if requested by the Union) sixty (60) days prior to any changes.

The Employer shall have the right to, among other rights as spelled out in the plan documents, change carriers, change administrators, change funding methods, insure, or self-insure all or any part of the benefits provided. The initial program is_ from     United Healthcare Bronze HMO 54J 2V RX as set forth in the plan documents and given to the Union on January 25, 2017 as those documents may from time to   time be amended and which are hereby incorporated by reference into and made a part of this Agreement.

11.2    Effective June 1, 2017 the Company agrees to offer to all eligible employees a Company offered private health insurance program that meets or exceeds all State or Federal healthcare requirements. The Company will offer other optional coverage's to include but not limited to dental, vision, employee and spouse, employee and child or children and family coverage. The base plan will meet any State or Federal affordability requirements. The base plan coverage will be single coverage only and the cost of any optional coverage (if any) chosen by the employee will be at the employee's expense.

11.3   Effective June 1, 2015 for purposes of this provision, the term regular full time employee shall have the same meaning as provided for in the Federal Patient and Affordable Care Act as that term may from time to time be amended. Should during the life of this agreement the Federal Patient and Affordable Care Act be repealed or replaced the term Full time employee will be defined as in Section 12.2 of this contract.

11.4   The employees cost of coverage will be deducted pre-taxed (as allowed by law) from the employee's paycheck. The deductions will be done bi-weekly (26 times per year).

11.5   During the month of February of each year there will be open enrollment of thirty (30) days. If the Company needs to change the open enrollment period in future years they will give the employees a thirty (30) notice of the change.

## ARTICLE XII - FULL-TIME AND PART-TIME EMPLOYEES

12.1   The basic work week for a full-time employee is five (5) days at seven and one-half (7½) hours per day. Sunday thru Saturday.

12.2   A regular part-time employee is an employee who is regularly schedule to work less than thirty-seven and one-half (37½) hours but more than fifteen (15) hours per week, Sunday thru Saturday.

12.3   A regular part-time that works thirty-seven and one-half (37½) hours or more for four (4) consecutive weeks will become a full-time employee at the start of the next payroll period.

12.4   A Casual employee is an employee that is scheduled to work fifteen (15) hours or less per week and is a non-union employee. The use of casual employees is not intended to limit the opportunity of regular full and part-time employees to be scheduled for regular straight-time hours.

12.5   The employees pay day is every other Friday. The Employer may only change the payday with a sixty (60) day notice.

## ARTICLE XIII - LUNCH PERIOD AND REST PERIODS

13.1   Employees working a shift of more than four (4) hours will normally be allowed a thirty (30) minute lunch period without pay.  No lunch period will be provided for employees working a shift of four (4) hours or less.

13.2   Employees shall receive two (2) fifteen (15) minute uninterrupted rest periods, except in emergencies, without loss of pay, in any one workday.  The rest periods shall be scheduled approximately within fifteen (15) minutes of the employees' half (½) shifts. Employees working four (4) hours but less than seven (7) hours shall be entitled to one (1) rest period.  Employees assigned to work overtime for a continuous period of four (4) hours or more after the end of their regular shift will be granted an additional rest period of fifteen (15) minutes during the overtime period.

13.3   The Employer will furnish an "Employees Only" lunchroom. This lunch room will include employee lockers, a Microwave and a Refrigerator for employee usage.

## ARTICLE XIV - SENIORITY

14.1   Seniority shall be defined as the length of continuous employment with the Employer. Under this definition, the last employee hired shall be the first to be laid off, or reduced in hours, provided the remaining employees can satisfactorily perform the available work. Temporary absence from work, as set forth in this Agreement, shall not break seniority. Seniority may be broken only by:

(a)   quit;

(b)   justifiable discharge;

(c)   if an employee has been continuously laid off for a period of more than six (6) months;

(d)   failure by the employee to notify the Employer within three (3)days of recall that he/she will return to work;

(e)   failure of an employee to return to work, after recall from layoff within five (5) days from date of notification of recall;

(f)   failure of an employee to return to work in accordance with the terms of a leave of absence.

Recall to work shall be governed by the same principles of seniority.

14.2    The Employer shall give written notice of available vacancies within the bargaining unit by posting upon an appropriate bulletin board a notice that a job vacancy exists, setting forth therein the job category and schedule of work hours. This notice shall be posted for five (5) calendar days, but during these five (5) calendar days the Employer may temporarily assign any employee to fill this vacancy. The Employer shall fill vacancies, in the first instance, from person bidding who are in the same job category, irrespective or whether full-time or part-time employees. If the vacancy is not filled in this fashion, the bids of employees in job categories other than the one in which the vacancy exists shall next be considered.

The Employer shall fill vacancies on the basis of reasonable qualifications and the ability to having the greatest seniority shall fill the vacancy.

14.3    An employee from a different job category shall be a probationary employee in his/her new job category for a period of ninety (90) days. During this probationary period, the Employer shall have the right to determine the qualification of the employee in the new job classification, but the employer shall not exercise this power of judgment in an arbitrary or capricious manner.

In the event an employee bidding on a new job category is found not to be qualified, his/her position.

14.4    Upon the Union's request, the Employer shall furnish the Union with a current seniority list covering all names, rates of pay, dates of hire and classification of each employee.

14.5    When an employee is promoted or transferred from a bargaining unit job to a position outside the unit, he/she shall continue to accumulate seniority for six (6) months and shall accumulate none thereafter. If he/she is transferred back to the bargaining unit, he/she shall be entitled to a job in accordance with such accumulated seniority and ability as if he/she had been on layoff. An employee who is employed by the Employer originally in a supervisory position outside the bargaining unit shall not accumulate seniority while working as a supervisor.

## ARTICLE XV - RATES OF PAY

Job classifications in existence on the date of this Agreement, the rates of pay and progression schedules applicable thereto and the effective dates of said rates are set forth in Exhibit A, attached hereto and made a part hereof.

## ARTICLE XVI - HOLIDAYS

16.1    The following days shall be recognized as holidays under this Agreement for all employees who have completed their probationary period: New Year's Day, Martin Luther King Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day. After one (1) years of employment, full-time employees shall have their birthday as a paid holiday.

Part-time employees that have completed his/her probationary trial period will receive a pro-rated holiday pay based on the employee's average hours paid. This average will be based on the past eight (8) weeks. Part-time employees are not eligible for birthday pay.

16.2    To be eligible for holiday pay, an employee must satisfy all of the following requirements:

(a)    He/she must have worked his/her full scheduled workday before and his/her full scheduled workday following the holiday unless excused by the Employer for good cause;

(b)    He/she must have worked in the two (2) week payroll period in which the holiday occurs unless on vacation or sick leave. If the employee is on sick leave, then the employee must return to active duty prior to the date of the holiday.

16.3    Holiday work shall be scheduled by the Employer and shall be rotated among all employees who volunteer for holiday work. Should an insufficient number of employees volunteer, the Employer shall have the right to schedule from the least senior in inverse order. Senior employees shall have the right to the holiday schedule with the greatest number of hours.

16.4   If a holiday falls within an employee's scheduled vacation, such employee, if otherwise eligible, shall, at the request of the employee and at the option of the Employer, be paid Holiday pay in addition to his/her vacation pay, or granted an additional day of vacation.

16.5   An employee scheduled to work on a holiday but who fails to report shall not be eligible for holiday pay unless excused by the Employer for good cause.

16.6   All employees who work on a Holiday shall be paid the equal number of hours as worked on the holiday not to exceed one (1) shifts' pay at straight-time as holiday pay or their individual pro-rata if they do not work on holiday.   Such holiday pay will not exceed eight (8) hours of pay. Time work over eight (8) hours will be paid in accordance with Section 8.2

**ARTICLE XVII - VACATIONS**

17.1   Full-time employees shall be granted vacations with pay based upon their years of continuous service with the following schedule:

5 days per year .................................................................after 1 year of service
10 days per year ........................................................... after 3 years of service
15 days per year ........................................................... after 5 years of service
20 days per year .......................................................... after 10 years of service

Employees shall have the right to have seven (7) consecutive days off for a vacation.

Example:  After one (1) year of service; five (5) paid days off plus two (2) regular days off.

17.2(A) For the calendar year of 2014, regular part-time employees working a minimum of twenty (20) hours per week, after three (3) years of service, earn one (1) week of vacation time paid at twenty (20) hours.  Part-time employees cannot use their vacation time as single days off.

Effective January 1, 2015 and starting with the employee's anniversary date, part-time employees shall be granted vacations with pay based upon their years of continuous service with the following schedule:

13

5 days per year ................................................................................after 1 year of service

10 days per year ........................................................................ after 3 years of service

15 days per year ........................................................................ after 8 years of service

17.2(B) All Union employees shall receive, for each week of vacation, pay equal to their normal week's base pay. Vacation pay will be computed based upon the rate received by the employee as of the time the vacation is taken. Employees who are regularly scheduled to work shall receive, for each week of vacation, benefit pay based upon the total number of regular hours worked the previous year divided by twenty-six (26) two (2) week pay periods. Regular hours include all compensated straight-time hours.

17.3 An employee's vacation eligibility year is the twelve (12) month period immediately preceding the anniversary of his/her last date of hire and is the period in which he/she earns his/her vacation.

17.4 Employees must take their vacation during the twelve (12) month period following their vacation eligibility year. Employees who have worked at least six (6) months past their anniversary date and resign will be entitled to receive vacation pay in lieu of vacation to the extent that such vacation pay has been earned on the date of termination of employment.

17.5 An employee will receive vacation pay on the last established payday prior to the start of the vacation. Vacations earned must be taken; however, if the Employer requests and the employee agrees to work in lieu of vacation, he/she shall be paid his/her regular pay plus earned vacation pay.

17.6 All employees can take their vacations by seniority and mutual agreement with the Employer. A vacation schedule shall be posted by Department, no later April 1st each year. Vacations shall be granted by Seniority and by Department no later than May 15th each year.

## ARTICLE XVIII - GRIEVANCE PROCEDURE

18.1 Subject to the provisions of Section 18.2, any grievance by the Union or any employee against the Jackson Park Supportive Living Facility with respect to the interpretation or

14

application of, or compliance with, this Agreement or with respect to disciplinary action taken with any employee, including the reasonableness of any Employer rules of conduct or regulations under which the disciplinary action may have been taken, shall be settled in the following manner:

(a)     The Union representative involved shall orally discuss the grievance with the Director. The Director shall reply orally to the grievance.

(b)     If the matter is not satisfactorily adjusted in step (a) the grievance shall be reduced to writing and submitted to the Director of the facility. The written grievance shall contain a brief statement of the nature of the grievance and shall state the relief sought. The Director or his/her designee shall reply to the grievance within seven (7) days.

18.2    When in the judgment of either party arbitration is necessary, either party may initiate same by notifying the other party in writing that it has invoked the arbitration provisions of the Contract and that it has requested the Federal Mediation and Conciliation Service to submit a panel of arbitrators to the parties. In no event shall arbitration be initiated earlier than seven (7) days following mailing of the written grievance. The parties shall promptly proceed to select an arbitrator from the panel and proceed to arbitrate the grievance all in accordance with the rules of the Federal Mediation and Conciliation Service. The decision of the arbitrator shall be final and binding on the parties.

18.3    Expenses incurred in connection with the arbitration, to wit, fees of the Federal Mediation and Conciliation Service, the arbitrator's fees and expenses and rental of hearing room, if necessary, shall be shared equally by the parties.

18.4    All grievances except those hereinafter specified must be presented in the first step of the grievance procedure within seven (7) days, except for wage claims which shall be presented within a reasonable time, from the date the cause for the grievance occurs or the employee or the Union has knowledge of the cause for the grievance, not to exceed 30 days.

18.5    Stewards selected by the Union will be permitted to discuss grievances with representatives in the appropriate steps of the grievance procedure during normal

working hours without loss of pay, provided that such discussion shall not exceed a reasonable period of time and shall not interfere with resident care.

## ARTICLE XIX - NO STRIKE -NO LOCKOUT

19.1    The Union will not cause or permit its members to cause, and will not sanction in any way, any strike, slowdown, picketing, or other curtailment, restriction, or interference with any Employer functions or operations for any reason whatsoever, and no employee will participate in any such activities during the term of this Agreement or any extension thereof.

19.2    The Employer agrees that it will not lock out its employees during the term of this Agreement or any extension thereof.

## ARTICLE XX - LEAVE OF ABSENCE

20.1    Upon approval of the Employer, employees may be granted a leave of absence without pay for a period not to exceed ninety (90) days provided a written application is submitted to the Employer setting forth a good cause for the leave of absence and such leave does not interfere with the efficient operation of the department and provided further that may be extended by the Employer at the request of the employee for an additional period or periods of ninety (90) calendar days. Normally a leave of absence will not be granted during the first year of employment except for short duration in emergency circumstances.

20.2    Military leaves of absence and the re-employment right of employees who serve in the Armed Forces of the United States will be determined on the basis of applicable Federal Law.

20.3    Injury or Illness Leave    A leave of absence without pay of up to one (1) year shall be granted to employees unable to work because of injury or illness. The employee shall be reinstated to his/her previous classification if available upon furnishing the Employer with a physician's report certifying that he/she is capable of returning to work.

20.4    Employees on approved leaves of absence shall retain seniority, but shall not accrue other benefits during the leave of absence, except for the first sixty (60) calendar days of absence resulting from an accident occurring on the job.

20.5    <u>Funeral Leave</u>   Full-time employees shall be allowed up to three (3) days paid time off to make the necessary arrangements and to attend the funeral for the death of a current spouse, mother, father, child, stepchild, brother, sister and two (2) days with pay for grandparents (of the employee), grandchildren, current mother-in-law and current father-in-law.   Part-time employees will be allowed to take the same time off, without pay.

20.6    **F.M.L.A:** The Company will comply with the Family Medical Leave Act. Eligible employees may take a family leave of absence (without pay) for a period of up to twelve (12) weeks, without loss of seniority or other rights.

Employees must comply with FMLA guidelines with regards to medical certification for leave of absence. If the employee has health insurance they must continue to pay their normal portion for up to twelve (12) weeks. After twelve (12) weeks the employee will receive Cobra notification to elect continuation of coverage on their own.

20.7    All employees requesting leave of absence for the birth or adoption of a child must adhere to the federal guidelines outlined by the FMLA act. Employees must apply for and supply medical certification regarding their maternity leave. Employees, if approved, will be granted up to twelve (12) weeks off without pay Employees must be employed for one (1) year and have worked at least 1,250 hours. However, if the employee has vacation, sick or personal Holidays they will be exhausted during the leave of absence. The employee must bring a medical release fro their doctor stating they are physically able to return to normal unrestricted duties. After twelve (12) weeks the employee will receive Cobra notification to elect continuation of coverage on their own.

## ARTICLE XXI - GENERAL PROVISIONS

21.1    The Employer will continue to make reasonable provisions for the safety of its employees during their hours of employment.   Two (2) employees from the bargaining unit mutually

agreed upon by the Employer and the Union shall serve on the Employer's safety Committee.

21.2    The Employer shall provide the employee's first two (2) uniforms. Thereafter, the employees shall, upon request, receive two (2) uniforms per year on his/her anniversary date. All employees shall maintain their own uniforms. Should the Employer change the uniforms, the Employer will provide the first two (2) free uniforms to each employee.

21.3    The Employer will make bulletin boards available for the use of the Union in suitable and sufficient non-public locations. The Union will be permitted to post on these bulletin boards notices of a non-controversial nature, copies to be submitted to the Director prior to posting. There shall be no distribution or posting by employees of advertising or political material, notices or kinds of literature on the Business property other than herein provided.

21.4    In the event any of the provisions of this Agreement shall be or become invalid or unenforceable by reason of any Federal or State Law now existing or hereinafter enacted, such invalidity or unenforceability shall not affect the remainder of the provisions hereof. The Company and the Union agree to meet within thirty (30) days following such a holding or determination for the purpose of negotiating a substitute clause to replace the provision found to be invalid.

21.5    Within a reasonable time after the giving of notice, the parties shall designate their representatives for the purpose of collective bargaining negotiations.

21.6    The Employer will provide for Vending Machines for the employee's use during breaks and lunch periods. Employees shall have a vending Committee.

21.7    Employees who work less than thirty-seven and one half (37½) hours per week shall receive benefits on a pro rata basis, using the formula in Section 17.1 of this Contract. One day of benefit shall be calculated by taking the one week average and dividing it by five (5). Part-time employees shall not be entitled to sick pay or death benefits, nor shall the Employer be obligated to make contributions to Health and Welfare coverage.

21.8    The Employer shall notify the Union of any discharge of any union employee, within seven (7) days stating the date of discharge and the reason. A phone call to the union office with the information will count as notification.

The Employer will utilize written warning notices along with individual counseling sessions. Copies of the written notices will be forwarded to the Union when requested.

It is mutually agreed by the Company and the Union that no warning notices need be given prior to discharge with just cause.

21.9    Employees shall have the right to request and if approved by the Company transfer to another of the Company's buildings without the loss of wages, benefits and seniority (towards vacation time earned). Employees have the right to transfer to fill a job opening but not to displace an employee.

## ARTICLE XXII - SICK DAYS

22.1    All current full-time employees hired before June 1, 2017 will earn one (1) sick day for each two (2) months worked, for a total of six (6) days per year. New full-time employees are not entitled to take sick time during the first ninety (90) days. After the first ninety (90) days full-time employees earn sick time from date of hire. Part-time employees do not receive sick pay.

22.2    All current Full-time employees hired before May 31, 2009, will be paid for up to three (3) days of unused sick time. Payment will be received by January of the next year.

22.3    All current Full-time employees hired after May 31, 2009 but before June 1, 2017, that have taken one (1) or fewer sick days during the calendar year will receive payment of one half (1/2) of his/her unused sick time up to a maximum of three (3) days. Payment will be made by January 31st of the following year.

22.4    All current full-time employees hired before June 1, 2017 who resign and give two (2) weeks notice will receive up to three (3) unused sick days with their last check.

Employees terminated for just cause shall not be paid out sick time.

22.5    Effective June 1, 2017 the Company will follow The City of Chicago sick time ordinance. Full time Employees' hired before June 1, 2017 will continue to receive the benefits as listed above.

Should the City of Chicago's sick time ordnance be repealed and no replacement is passed, the Company will follow the Cook County sick time ordinance. If Both City and Counties ordnances are repealed and no replacement ordinance are passed the original language in Article 22 of the previous labor agreement dated June 1, 2014 through May 31, 2017 will be used to replace them.

## ARTICLE XXIII - SUCCESSORSHIP

In the event of any sale, purchase, merger, or other transaction affecting ownership of the Employer's business or ownership of the assets of the Employer's business, the Employer agrees to make known the existence of this Agreement and its terms and conditions to the other party prior to any such transaction. The Employer also agrees to provide the Union with the all contact information of the future owner or ownership group.

## ARTICLE XXIV -TERM OF AGREEMENT

24.1 This Agreement constitutes the entire agreement between the parties and concludes all collective bargaining negotiations for the term hereof. In as much as both parties have had a full opportunity to negotiate with respect to all matters relating to wages, hours, and all other terms and conditions of employment, neither party is under any duty to bargain with respect to any changes, modifications or additions to this Agreement to take effect during its term.

24.2 This Agreement shall become effective as of June 1, 2017, and shall remain in effect until May 31, 2020. It shall automatically renew itself from year to year thereafter unless either party shall give written notice to the other party not less than ninety (90) days prior to May 31, 2020, or any subsequent anniversary date thereafter, that it desires to modify or terminate this Agreement.

IN WITNESS WHEREOF, the parties hereto caused this Agreement to be executed by their duly authorized representatives the day and year first above written.

Signed this _____5th_____ day of _____July_____ 20 17

**JACKSON PARK SLF LLC**

Signature

Region al Director of Ops.
Print Name/Title

**UNITED FOOD & COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 1546**

Robert W. O'Toole, President

Contract #036800

21

## EXHIBIT A

## WAGE INCREASES/LONGEVITY WAGES

**A.1**    Effective July 1, 2017 all employees will receive the following:

All employees with less than one (1) year of service as of July 1, 2017 will receive his/her minimum wage increase (if eligible) plus a one time bonus of One Hundred Dollars ($100.00). This bonus will be paid within thirty (30) days.

All employees with one (1) year but less than two (2) years of service as of July 1, 2017 will receive his/her minimum wage increase (if eligible) plus a Thirty Cent ($0.30) per hour increase.

All employees with two (2) or more years of service as of July 1, 2017 will receive his/her minimum wage increase (if eligible) plus a Thirty Five Cent ($0.35) per hour increase.

Effective July 1, 2018 all employees will receive the following:

All employees with less than one (1) year of service as of July 1, 2018 not will receive a contract raise increase at this time, but will receive his/her minimum wage increase (if eligible).

All employees with one (1) year but less than two (2) years of service as of July 1, 2018 will receive his/her minimum wage increase (if eligible) plus a Thirty Cent ($0.30) per hour increase.

All employees with two (2) or more years of service as of July 1, 2018 will receive his/her minimum wage increase (if eligible) plus a Thirty-Five Cent ($0.35) per hour increase.

Effective July 1, 2019 all employees will receive the following:

All employees with less than one (1) year of service as of July 1, 2019 not will receive a contract raise increase at this time, but will receive his/her minimum wage increase (if eligible).

All employees with one (1) year but less than two (2) years of service as of July 1, 2019 will receive his/her minimum wage increase (if eligible) plus a Thirty Cent ($0.30) per hour increase.

All employees with two (2) or more years of service as of July 1, 2019 will receive his/her minimum wage increase (if eligible) plus a Thirty-Five Cent ($0.35) per hour increase.

The Current City of Chicago minimum wage is Eleven Dollars ($11.00) per hour as of July 1, 2017 and is scheduled to increase to Twelve Dollars ($12.00) per hour on July 1, 2018 and is scheduled to increase to Thirteen Dollars ($13.00) per hour on July 1, 2019.

If Any Governmental body increases the minimum wage above the current City of Chicago (listed above) minimum wage, this increase will be deducted from the next contractual increase provided above. If the State or Federal Government increases its reimbursement to the employer and this increase is required to be "ear marked" or "passed through" to cover the cost of the increase in minimum wage, then this Section of A.1 above will be inoperative to the extent that the required "ear mark" or "pass through" applies to such increase.